Salix State Bank, Petitioner *v.* Commonwealth of Pennsylvania, Department of Banking, Respondent.

Argued March 12, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., MENCER, ROGERS, BLATT, CRAIG and WILLIAMS, JR. Judge MACPHAIL did not participate.

*Edward F. Peduzzi,* of *Myers, Taylor & Peduzzi,* for petitioner.

*John E. Nanorta,* Chief Counsel, with him *Bonnie Jean McRobbie,* Assistant Attorney General and *Edward G. Biester, Jr.,* Attorney General, for respondent.

OPINION BY JUDGE WILKINSON, JR., April 9, 1980:

Pursuant to Pa. R.C.P. No. 1035, the respondent Department of Banking (Department) has filed its motion for summary judgment on a petition for review in which petitioner Salix State Bank (Salix) seeks an order of this Court reversing a Department order and enjoining the Department from requiring Salix to rebate to borrowers alleged unlawful interest charges. The case has proceeded as one within the Court's orig-

inal jurisdiction in the nature of a complaint in equity questioning a governmental determination. *See* Pa. R.A.P. 1512(c), 1513. In *Salix State Bank v. Department of Banking,* 36 Pa. Commonwealth Ct. 120, 387 A.2d 673 (1978), we dismissed the Department's preliminary objections to the petition for review and directed the Department to file an answer; it did so. Salix and the Department have agreed to a stipulation of facts.

The governmental determination in question is a letter dated July 1, 1977 issued by the Deputy Secretary of Banking finding that certain insurance premium financing contracts entered into by Salix constitute direct rather than third party loans, thereby subject to lesser lawful maximum interest rates than charged by Salix, and directing Salix to rebate the excessive interest charges.

From the stipulation of facts the Court discerns the following essential facts. Insurance agents or brokers assisted customers by securing the issuance of insurance policies upon collection of at least 25 percent to 30 percent of the total premiums charges as down payment from the insureds and by filling out forms provided by Salix whereby the insureds sought financing for the balance of the premiums due. The agents or brokers submitted completed forms to Salix for examination and acceptance. The insurance company issuing the policy was not a party to any application for premium financing; its name appeared on the forms only in the context of the insured's representation to Salix that the insurance policies were issued and in effect. If upon examination the filled out forms were acceptable to Salix, it would process the loan. Salix prepared checks in amounts representing the balance due on the total insurance premiums, made the checks payable to the agents or brokers who submitted the forms to Salix, and mailed the checks to the

named agents or brokers. The insureds were required
to make installment payments to Salix. If the insured
was in default on any installment payments for a pe-
riod of 15 days or more, Salix would call the agent or
broker and direct cancellation of the insurance policy.
The interest rates charged in connection with the
loans made by Salix through the use of these instru-
ments ranged from 15 percent to 35 percent annual
percentage rate, with the average in the range of 18
percent to 19 percent annual percentage rate. Under
the terms of the form, the insureds assigned to Salix,
as security for the payment of the balance due on the
insurance premiums, certain nonvested rights they
either had or may have under the insurance policy,
including rights to dividends, unearned premiums, and
agent's or broker's commissions which may become
payable to the insureds. Through the forms the com-
pany issuing the insurance policy made no assignment
of any rights.

Section 309(a) of the Banking Code of 1965
(Code), Act of November 30, 1965, P.L. 847, *as amend-
ed,* 7 P.S. §309(a) provides in pertinent part:

    (a)  Maximum rate — An institution may
make a charge for an installment loan which
complies with the requirements of this section,
at a rate not in excess of six dollars ($6) per
one hundred dollars ($100) per annum com-
puted on the original principal amount for the
period of the loan.

It is the Department's position that the arrangement
by which Salix financed insurance premiums resulted
in direct loans by Salix subject to the limitations of
Section 309(a) of the Code.

Salix contends that the "time-price differential"
doctrine, which stands for the proposition that usury
statutes do not apply to installment sales of goods and
services, *see Equipment Finance, Inc. v. Grannas,* 207

Pa. Superior Ct. 363, 218 A.2d 81 (1966), is applicable here and that Salix, as the assignee of installment sale contracts, may collect a rate of interest greater than six percent per annum. In order for a transaction to fall within the doctrine, there must be a bona fide sale of goods. *Daniel v. First National Bank*, 227 F.2d 353 (5th Cir. 1955). Salix argues that its actions constituted acceptance of assignment of completed agreements between the insureds and their agents or brokers and likens the situation here to the assignment of installment sale contracts by automobile dealers or retailers.

An installment sale purchase of a good is a direct contract between the buyer and seller. It is customary procedure for the seller to assign the installment sale contract to a financing entity which purchases it for consideration. Where such assignment is effected, the assignee has made an indirect, third party loan and is able to assume the rate of interest authorized to the seller under the installment sale contract.

The only Pennsylvania court which has dealt with the issue of insurance premium financing was the Dauphin County Court of Common Pleas[1] in *Weaver, Grose, Langhart & May, Inc. v. Myers*, 17 Pa. D. & C. 2d 405 (1958). The Secretary of Banking had found that the insurance agency in *Weaver, id.* was engaged in the business of lending money in sums less than

---

[1] The jurisdiction given to the Commonwealth Court by its enabling legislation, The Commonwealth Court Act, Act of January 6, 1970, P.L. (1969) 434, *as amended*, 17 P.S. §211.1 *et seq.*, repealed by the Judiciary Act Repealer Act of 1978, Act of April 28, 1978, P.L. 202, §2(a)[1439] (similar provisions may be found in the Judicial Code, 42 Pa. C.S.), was substantially that of the Dauphin County Court of Common Pleas at its Commonwealth Docket. For a full treatment of the history and expansion of the jurisdiction of the Commonwealth Court, *see The Commonwealth Court of Pennsylvania: Jurisdiction and Jurisdictional Questions*, 47 Temp. L.Q. 86 (1973).

$2,000 for the purpose of enabling individuals to pay premiums on insurance policies purchased through itself or through other insurance agents and was charging interest in excess of six percent per annum on the loans in violation of the Consumer Discount Company Act (Act), Act of April 8, 1937, P.L. 262, *as amended,* 7 P.S. §6201 et seq. The Secretary of Banking issued a cease and desist order against the insurance agency. The insurance agency then brought an action in equity to restrain enforcement of the cease and desist order. The insurance agency there contended that its conduct fell within the installment sale contract exception to the Act.

The court of common pleas initially found that the insurance agency's practice of (1) advancing to insurance companies the premium due to them upon insurance placed by the agency and then (2) collecting on an installment basis from its customers the amount of money advanced for the payment of their policies, together with additional charges exceeding six percent per annum on the amount actually advanced to the insurance companies, constituted the making of loans or advances of money or credit within the meaning of the Act. Faced with the insurance agency's argument that it was selling insurance on the installment plan, the court of common pleas next examined whether there was present a sale of personal property such that the exception to the Act was operative. The court wrote:

> Apparently plaintiff's principal object as an insurance agent or broker is to bring into existence an insurance contract between other insurance companies and third persons who are customers of plaintiff. The act of an insurance company in assuming a contingent liability by contract or to pay money does not constitute a 'sale of property.' (Footnote omitted.)

17 Pa. D. & C. 2d at 412.

The court went on to state in arguendo fashion at 414:

Even if the issuance of an insurance policy constitutes a sale of personal property, plaintiff could not avail itself of the exemption in section 17 of the Consumer Discount Company Act because it is *not plaintiff* which would be selling a contract right to the insured. If any sale occurs, it is between the insurance company and the insured, with plaintiff acting merely as an agent or broker. In the instant case, the insurance company, i.e., the 'seller', is not extending the credit, but such credit is being extended by plaintiff, a stranger to the insurance contract, by means of an independent transaction between it and the insured. (Emphasis in original.)

The court of common pleas found a violation of the Act and dismissed the complaint in equity.

In the instant case we reject Salix's argument that its activities fit within an installment sales contract exception to the operation of Section 309(a) of the Code. The issuance of an insurance policy does not constitute a sale of goods or property. If any sale does occur, it is between the insurance company and the insured. The stipulated facts in the instant case make clear that no insurance company is a party to any application for premium financing, nor is any insurance company making assignment of any rights. *Weaver* establishes that the contract of insurance is a separate and distinct matter from the financing of the premiums. Integration of a careful examination of the stipulated facts in the instant case with the analysis in *Weaver* satisfies us that the interaction between Salix and the insureds was that of a direct lender-borrower relationship independent of the contract of insurance.

We find no merit in Salix's final contention that the Department is without authority to order the rebate. Accordingly, we will enter the following

## ORDER

AND Now, April 9, 1980, the Department of Banking's motion for summary judgment is granted.