658 P.2d 955

**RANGEN, INC., an Idaho Corporation, Plaintiff, Counter-Defendant, Respondent, Cross-Appellant,**

v.

**VALLEY TROUT FARMS, INC., an Idaho Corporation, Defendant, Counter-Claimant, Appellant, Cross-Respondent.**

No. 13808.

Supreme Court of Idaho.

Feb. 3, 1983.

Dale G. Higer and Thomas R. Linville of Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, for defendant, counter-claimant, appellant, cross-respondent.

G. Kent Taylor, of Taylor, Beito & Stubbs, Twin Falls, for plaintiff, counter-defendant, respondent, cross-appellant.

McFADDEN, Justice Pro Tem.

Appellant Valley Trout Farms, Inc. is in the business of raising, feeding, caring for, harvesting, and marketing trout. Respondent and cross appellant Rangen, Inc. is engaged in, among other things, the manufacture and sale of fish food. For some time prior to July 1, 1977 the parties had frequent business dealings involving the sale of fish food. These transactions began when Valley Trout farms would send a purchase order to Rangen requesting certain amounts of feed, Rangen would then deliver it.

Some time prior to July 1, 1977, Rangen advised Valley Trout that it would close its books with respect to Valley Trout's purchase of fish food on the twenty-fifth of each and every month and that Rangen would send Valley Trout its bill indicating the previous month's purchases, and that the previous month's purchases would be due and payable thirty days after the billing date.

Around July 1, 1977, Rangen advised Valley Trout that it would cancel any "finance charge" debited to Valley Trout's account prior to July 1, 1977, but would charge on all purchases made after July 1, 1977, a "late charge" of 1% per month to be computed between the due date and the date paid on the principal amount owing between said dates. Subsequently, Rangen advised Valley Trout that the "late charge" would be computed at the rate of 1½% per month beginning April 1, 1978.

The transactions after the July 1, 1977 meeting began when Valley Trout would send a purchase order to Rangen requesting feed. Rangen would deliver the feed and at the time of delivery an invoice would be left with an employee of Valley Trout who would then acknowledge receipt of the fish food. Each invoice bore the following notation:

"Accounts due and payable before the 10th of month following month of purchase. 1% per month FINANCE CHARGE (ANNUAL PERCENTAGE

RATE 12%) applied to balance of all past due accounts from date due. Purchaser agrees to pay collection costs including a reasonable attorney fee if account is collected by suit or otherwise. Title to this property does not pass until fully paid for." [1]

The late charge appeared on the monthly statements sent to Valley Trout and the charge was paid on one occasion by Valley Trout in August 1977.

In April 1979 Rangen Inc. brought suit to recover on its open account for monies past due, finance charges and attorney fees. Valley Trout answered, asserting usury as a defense and counterclaimed for a quantity discount that had not been credited to their account.

Trial was held by the court sitting without a jury. Findings of fact, conclusions of law and judgment were entered in favor of Rangen for the monies past due with a credit to Valley Trout for the quantity discount. The district court held that there was no express contract for the imposition of the late charge and therefore disallowed that amount but allowed the statutory rate of interest pursuant to I.C. § 28–22–104. The district court also found that the usury defense was inapplicable because the transaction was not a loan of money or a forebearance. Both parties appeal from the judgment of the trial court. The issues raised by appellant Valley Trout on appeal are: (1) did Rangen charge a usurious rate of interest? (2) did the trial court err in not admitting evidence concerning the credit practices utilized by Rangen with its other customers? On its cross appeal Respondent Rangen raised the third issue: did the trial court err in failing to conclude as a matter of law that a contract existed for the payment of late charges on the open account? We affirm as to the issues presented by Valley Trout, but reverse as to the issues presented by Rangen.

1. In 1978 the finance charge was increased on the invoice from 1% per month to 1½% per

I

Usury is "[t]he taking, receiving, reserving, or charging a rate of interest greater than is allowed by this chapter when knowingly done." I.C. § 28–22–107. It has been established that to constitute usury there must be excessive interest or compensation on either a loan of money or forbearance or extension of time of payment on an existing debt. *Transportation Equipment Rentals, Inc. v. Ivie,* 96 Idaho 223, 526 P.2d 828 (1974); *Meridian Bowling Lanes, Inc. v. Brown,* 90 Idaho 403, 412 P.2d 586 (1966); *Freedman v. Hendershott,* 77 Idaho 213, 290 P.2d 738 (1955); *Bell v. Idaho Finance,* 73 Idaho 560, 255 P.2d 715 (1953).

The trial court concluded that the transaction involved here was neither a loan of money nor a forbearance on an existing debt. In *Bell v. Idaho Finance Co.,* 73 Idaho 560, 255 P.2d 715 (1953), this court stated

"It has become an accepted and settled rule of law that to constitute usury there must be an excessive interest or compensation on either a loan of money or forbearance or extension of time of payment of an existing debt."

Forbearance has been defined "as used in the law of usury [the term] signifies a contractual obligation of lender or creditor to refrain, during given period of time, from requiring borrower or debtor to repay loan or debt then due or payable." *State ex rel. Turner v. Younker Brothers, Inc.,* 210 N.W.2d 550 (Iowa 1973); *Hafer v. Spaeth,* 22 Wash.2d 378, 156 P.2d 408 (1945), *overruled on other grounds* in *Whitaker v. Spiegel, Inc.,* 95 Wash.2d 408, 623 P.2d 1147, 1152 (1981); *Cecil v. Allied Stores Corp.,* 162 Mont. 491, 513 P.2d 704 (1973); *Whitaker v. Spiegel Inc.,* 95 Wash.2d 408, 623 P.2d 1147 (1981). Even in *Crestwood Lumber Co. v. Citizens Savings and Loan Ass'n,* 83 Cal. App.3d 819, 148 Cal.Rptr. 129 (1978), which will be discussed more fully below, the California Court of Appeals First District

month, an annual rate of 18%.

defined forbearance as "the giving of further time for the repayment of an obligation or an agreement not to enforce a claim at its due date."

■ The issue therefore becomes: did Rangen agree to extend the time for payment in consideration for late charges computed at the 12% and 18% annual rate. The trial court concluded that there was no forbearance and that conclusion is supported by the record. On its face the term provides that the finance charge will be levied for all past due accounts. The testimony at trial reflects that the account was due within 30 days from the date of billing and Rangen never gave Valley Trout more than 30 days to pay its bill. There was no express agreement or contractual obligation for Rangen to forego an immediate action on the account if it became overdue or to forego a demand for immediate payment. This element being absent from the transaction, there was no forbearance within the meaning of the usury statutes and such statutes are inapplicable. *Hafer v. Spaeth, supra; Cecil v. Allied Stores Corp., supra; State ex rel. Younker Bros., supra; Whitaker v. Speigel Inc., supra.*

Valley Trout Farms contends that there was a forbearance of an existing debt, relying on the California Court of Appeals' decision in *Crestwood Lumber Co. v. Citizens S & L Ass'n, supra,* as authority. The court in *Crestwood Lumber* held that there was a forbearance. The court stated, in regard to the language imposing the charge on overdue accounts,

"Appellant's other contention, that no forbearance occurred because it never agreed to provide further time for payment, is not reconcilable with the record. Appellant's own invoices and sales orders plainly state that 'A FINANCE CHARGE OF 1½% PER MONTH (ANNUAL PERCENTAGE RATE OF 18%) WILL BE MADE ON ALL OVERDUE ACCOUNTS.' It can hardly be asserted that such language did not constitute an

implied agreement to give further time for payment in exchange for an 18 percent surcharge on the principal."

In our opinion the reasoning of the *Crestwood* court is flawed and we decline to follow it. We cannot agree that an implied agreement to forego payment arose under those facts. There was no refinancing in the *Crestwood* case. Under those facts the buyer would be free to ignore the payment of the principal amount due as long as he paid the service charge each month. There was no provision for the amount of principal or interest to be paid each month nor a time limit within which it must be paid. In this situation it is conceivable that the forbearance could extend *ad infinitum* and the creditor would never recover the principal. The conclusion is that creditor would never be able to sue to collect the money past due because it was receiving consideration for its "agreement" to forbear on the account. The facts do not support such a conclusion.

The *Crestwood* court also stated:

"Although the trial court's judgment was correct as far as it resolved the issues presented to it, recent California cases have viewed 'late charge' provisions such as the one before us not as interest, but as liquidated damage clauses. . . .

If we examine the provision in question closely, it appears to be an attempt to assess liquidated damages."

There is an internal inconsistency in finding that the late charge term can be interest on the forbearance of money and, at the same time a liquidated damages clause. The former deals with a creditor agreeing to wait for his money and receiving consideration for the delay while the latter concerns a penalty for making him wait. In light of the faulty logic used in *Crestwood* we do not find it to be persuasive authority.[2] The California Court of Appeals, Second District, rendered an opinion in the case of *Fox v. Federated Department Stores Inc.,* 94 Cal.App.3d 867, 156 Cal.Rptr. 893 (1979), ten months after the First District's decision in

**2.** For a discussion of the *Crestwood* case see Loomis, *Crestwood Lumber Company v. Citizens Savings and Loan Association: The Usury*

Law and Liquidated Damages in Sale of Goods Transactions, 10 Golden Gate Univ.L.R. 553.

*Crestwood.* A citation to *Crestwood* is conspicuously absent from the *Fox* decision. Although the facts are similar the *Fox* court reached a different conclusion than the *Crestwood* court. It is this court's opinion the *Fox* decision is representative of a line of authorities which is better reasoned than the *Crestwood* decision and we are persuaded by its logic.

*Fox* involved consolidated actions challenging the validity of various charge account practices by several retail department stores and two oil companies. The court, citing to a specific California statute, the Unruh Act, adopted in 1959, concluded that the retail department store and oil company transactions were subject to the time price doctrine and therefore were not a form of interest within the meaning of the usury statutes. The court went on to state that the Mobil Oil Company transactions are not usurious for an additional reason. It is this part of the opinion which is relevant to the instant case. The court, in the Mobil portion of the opinion, 156 Cal. Rptr. 905, did not rely on the Unruh statute in its determination that the Mobil finance charge was not usurious. Mobil Oil issues two types of credit cards. The non-revolving plan for gasoline purchases was the type of card the court considered. Under that plan, payment for purchases is due upon receipt of the monthly statement and if not paid within twenty-five days thereafter a finance charge of 1½% per month is assessed on the balance due. The court stated, 156 Cal.Rptr. at 905,

"For still another reason, the Mobil finance charge is not usurious. As noted above, the Mobil credit card agreement requires the bill to be paid when rendered. It is only where the customer breaches the agreement and fails to make payment within twenty-five days of receipt of the bill that a finance charge is assessed. Since the contract at its inception does not require a usurious payment, and it is only because of the customer's voluntary act in failing to make the payment when due that a finance charge is levied, under the applicable law such charge cannot be usurious." (Citations omitted.)

The court then considered plaintiff's contention that if the late charge is not interest it must constitute damages and as such is an invalid liquidated damages provision within the prohibition of the California statutes. The court relied on the same factors as set forth in U.C.C. § 2–718 (although not citing to the U.C.C.) and concluded that if the finance charges are to be regarded as damages, they are a valid late charge and do not contravene the California statutes.

The federal district court for the District of Connecticut reached a similar result in the case of *Scientific Products v. Cyto Medical Laboratory, Inc.,* 457 F.Supp. 1373 (D.Conn.1978). The court addressed the issue of whether a late charge imposed on overdue accounts was usurious. Plaintiff in that action sought to recover a balance due from defendant for goods and supplies sold to the defendant. Defendant raised the defense of usury contending that the practice by plaintiff of imposing a monthly one and one half per cent service charge on the balances in arrears for more than 30 days constitutes usury. The court refused to extend the time price doctrine to this transaction but held in favor of the plaintiff on two other theories. The first theory is that the charge was clearly a charge for nonpayment and not a separate agreement to postpone collection in return for an additional consideration. The court stated, 457 F.Supp. at 1378:

"There is no dispute that the goods were sold at a price which was to be paid within 30 days. The allocation of interest to late payments and not to the price is clear. The charge of 1½% per month interest on the balance remaining unpaid after 30 days is clearly a charge for nonpayment. It was not a separate agreement to postpone collection in return for an additional consideration."

The court then addressed the additional theory and stated:

"Even if the transaction in this case were to be considered as one which could fall within the prohibition of the usury stat-

ute, it does not necessarily follow that charges at a rate in excess of that prohibited at the inception of a loan are usurious when imposed only on the unpaid balance after the loan has matured. There is no force in the mechanical argument that because the penalty for default is measured by a percentage of the amount of the debt it is an usurious interest charge. In a time-price sale a buyer does in reality agree to pay more money in order to defer payment. Here there was no agreement that the defendant could defer payment. Many cases have held that since charges of this nature are within the borrower's control, they are penalties for non-payment, rather than charges for the use of money, and, therefore, not affected by the usury laws. See *generally,* Annot., 'Provision for Interest After Maturity At a Rate in Excess of Legal Rate As Usurious or Otherwise Illegal,' 28 A.L.R.3d 449 (1969); 91 C.J.S. Usury § 31, at 608–611 (1955). The principle has been concisely stated in *Abbot v. Stevens,* 133 Cal.App.2d 242, 284 P.2d 159 (1955), as follows: 'Where the excessive interest is caused by a contingency under the lender's control, ... the transaction is usurious; [it is] otherwise when the contingency is under the borrower's control.' The rationale for the rule has also been stated as concisely: 'A debtor may not, by his voluntary act, render a transaction usurious which, but for such circumstances, would be entirely free from a claim of usury.' 91 C.J.S. Usury § 31, at 609."

As in *Fox* and *Scientific Products* Rangen was imposing a late charge on accounts in arrears over thirty days. For the reasons set forth in *Fox* and *Scientific Products* we agree that the usury laws are inapplicable to this type of transaction. The charge was a valid late charge which could have been avoided if Valley Trout had paid its account when due. There was neither an express or an implied agreement to forbear or extend the time for payment. The usury laws are inapplicable and the trial court was correct in so finding and concluding.

Additionally we note that the usury statutes were enacted to

"protect the necessitous debtor against extortion which he is practically helpless to resist. We have repeatedly, and recently, held that the usury laws were not designed to permit a debtor to default on a contract which was not clearly oppressive, which was not clearly within the prohibition of the usury law, and into which he had entered knowingly, freely and with arms length bargaining." *Bethke v. Idaho Savings and Loan Assoc.,* 93 Idaho 410, 414, 462 P.2d 503 (1969).

The contract between Rangen and Valley Trout is not clearly oppressive, it is not clearly within the prohibition of the usury statute, and it is between two businessmen. The policy behind applying the usury statutes is as absent from this transaction as is the agreement to forbear.

## II

■ Valley Trout contends that the trial court erred in not admitting evidence concerning the credit practices utilized by Rangen with its other customers. Valley Trout asserts that the testimony would have established to the court that Rangen does not take, receive, or charge its finance charges from its other customers until it obtains a written credit application. To be admissible the evidence must relate to and be confined to the matter in issue. *Williams v. Idaho Potato Starch Co.,* 73 Idaho 13, 245 P.2d 1045 (1952). Evidence offered must meet the test of materiality and relevancy. *Mountain States Tel. & Tel. Co. v. Jones,* 76 Idaho 241, 280 P.2d 1067. The admissibility of evidence generally rests in the sound discretion of the trial court. *See Stoddard v. Nelson,* 99 Idaho 293, 581 P.2d 339 (1978); *Rosenberg v. Toetly,* 94 Idaho 413, 489 P.2d 446 (1971); *Jones v. Talbot,* 87 Idaho 498, 394 P.2d 316 (1964). In *Howard v. Missman,* 81 Idaho 82, 337 P.2d 592 (1959), we held that where the question as to admissibility of evidence was borderline, the ruling of the trial court will not be disturbed. The issue involved in the instant case was not what Rangen's business practices were, but rather the relationship between Rangen and

Valley Trout. Valley Trout has not shown how the contracts with other customers would affect the Valley Trout-Rangen contract. Whether Rangen had a different relationship with its other customers was not relevant. The trial court did not abuse its discretion in refusing to admit the evidence.

### III

### RANGEN'S CROSS APPEAL.

This action involves the sale of goods as defined in I.C. § 28-2-105 so it is within the scope of the Uniform Commercial Code, codified as I.C. §§ 28-1-101 et seq. Section 28-2-204, dealing with formation in general provides that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Section 28-2-206, dealing with offer and acceptance in formation of contract, provides,

"(1) Unless otherwise unambiguously indicated by the language or circumstances
(a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances;
(b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods, but such a shipment of nonconforming goods does not constitute an acceptance if the seller seasonably notifies the buyer that the shipment is offered only as an accommodation to the buyer."

The facts disclose that when Valley Trout required fish food it would send a purchase order to Rangen. Rangen would reply by shipping the feed and including an invoice which was signed by one of Valley Trout's employees acknowledging receipt of the fish food. Under the Uniform Commercial Code, Valley Trout's purchase order is an offer to purchase which was accepted when Rangen shipped the feed, *supra*. By the conduct of the parties a series of contracts were formed. This is not a requirements contract under I.C. § 28-2-306, as contended by Rangen. Although Rangen was the primary supplier of fish food to Valley Trout the record does not show that it was Valley Trout's exclusive supplier.

Here each purchase order constituted a separate contract. The terms of contracts which contain additional terms in the acceptance are governed by I.C. § 28-2-207 which reads:

"Additional terms in acceptance or confirmation.—(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act."

Under the provisions of I.C. §§ 28-2-204, 28-2-206 and 28-2-207(1), Rangen's shipments of the food was an acceptance of the purchase orders. The invoice accompanying the shipment from Rangen provided an additional term, beyond that contained in the purchase order, the late charge. Under

§ 28–2–207(1) the shipment acted as an acceptance because "a definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon . . . ." [3]

Whether the additional term becomes part of the contract is determined by I.C. § 28–2–207(2). There is no question that Rangen and Valley Trout are "merchants" within the meaning of I.C. § 28–2–104 and therefore the additional terms become part of the contract unless one of the enumerated exceptions (§ 28–2–207(2)(a), (b) and (c) *supra*) is present. The trial court decided the issue under subsection (b). There is no language in Valley Trout's purchase orders which indicate that the offers were expressly limited to their terms, therefore subsection (a) is inapplicable. The president of Valley Trout testified that he was aware that a finance charge was being assessed on the account for late payments and yet no written objection was made to these charges until after this action was instituted by Rangen to collect on the account. Valley Trout had adequate notice of the late charge. Consequently, as "between merchants", the additional term will become part of a contract unless "it materially alters the contract" or notification has been given or is given within a reasonable time.

The trial court concluded that this additional term was a material alteration of the contract. However, it is our interpretation that the trial court erred in its application of I.C. § 28–2–207(2)(b) and therefore we reverse the judgment in this regard.

■ The trial court compared the amount of interest Rangen would have received if the term did not become part of the contract, and the interest Rangen would receive if the term were incorporated. The former figure was $1,400 and the latter amounted to approximately $27,000. The court therefore concluded that this was a "material alteration in anyone's view." This view might seem logical except for comment 5 to I.C. § 28–2–207 which provides,

> "Examples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given are . . . a *clause providing for interest on overdue invoices or fixing the seller's standard credit terms where they are within the range of trade practice and do not limit any credit bargained for. . . ."* (Emphasis added.)

It is the view of the drafters of the code that this type of term, which adds a finance charge for past due accounts, is not a material alteration under the code. Courts of other jurisdictions which have dealt with this issue are in accord. *Tim Hennigan Co., Inc. v. Nunes, Inc.,* 437 A.2d 1355 (R.I.1981); *F.D. McKendall Lumber Co. v. Kalian,* 425 A.2d 515 (R.I.1981); *Interlake Inc. v. Kansas Power & Light Co.,* 7 Kan.App.2d 16,

---

**3.** "Comment to Official Text . . . . Purposes of Changes: 1. This section is intended to deal with two typical situations. The one is where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal acknowledgments or memoranda embodying the terms so far as agreed upon and adding terms not discussed. The other situation is one in which a wire or letter expressed and intended as the closing or confirmation of an agreement adds further minor suggestions or proposals such as 'ship by Tuesday,' 'rush,' 'ship draft against bill of lading inspection allowed,' or the like.

2. Under this Article [Chapter] a proposed deal which in commercial understanding has in fact been closed is recognized as a contract.

Therefore, any additional matter contained either in the writing intended to close the deal or in a later confirmation falls within subsection (2) and must be regarded as a proposal for an added term unless the acceptance is made conditional on the acceptance of the additional terms.

3. Whether or not additional or different terms will become part of the agreement depends upon the provisions of subsection (2). If they are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party. If, however, they are terms which would not so change the bargain they will be incorporated unless notice of objection to them has already been given or is given within a reasonable time."

637 P.2d 464, 465 (1981); *Cf. Loizeaux Bldrs. Supply Co. v. Donald B. Ludwig Co.,* 144 N.J.Super. 556, 366 A.2d 721 (1976) (where the service charge term was in fine print on the bottom of the monthly summary statements and not on the invoices. The court did consider other terms appearing on the invoices to be part of the contract.) *School Dist. of Springfield v. Transamerica Co.,* 633 S.W.2d 238 (Mo.App.1982) (recognizing that this is not a material alteration under the code, but requiring unequivocal notice that the charge would be imposed). It is our conclusion that the additional provision in the invoice was not a material alteration of the contract within the meaning of the code. While the term becomes part of the contract by operation of law under § 28–2–207, it does not necessarily follow that the term will be enforceable. If the term is unconscionable or unreasonable, it will be unenforceable under other provisions of the code.

The Comment to the official text of I.C. § 28–2–207 contains a cross reference to I.C. § 28–2–718, indicating that the purpose of § 28–2–207 is to include the liquidated damage term automatically in a contract and that the purpose of § 28–2–718 is only to judge the enforceability of the liquidated damage term once it is found to be part of the contract. Section 28–2–718 states, in pertinent part:

"Liquidation or limitation of damages—Deposits.—(1) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty."

The 1% and 1½% per month service charges are reasonable in light of the anticipated or actual harm caused by the breach, when there may be difficulties of proof of loss and it may be inconvenient or nonfeasible to obtain an adequate remedy. Section 28–2–718 specifically states that unreasonably large liquidated damages are void as a pen-alty thereby limiting the amount of the service charge and preventing undue hardship. Additionally, the damages provided for by contract are limited by § 28–1–102(3) which provides, "[t]he effect of provisions of this act may be varied by agreement, except as otherwise provided in this act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this act may not be disclaimed by agreement ..." Consequently, parties are always required to deal in good faith and contract interpretation under the code will include the consideration of reasonableness. Section 28–1–106, dealing with remedies is also relevant to the instant case. It states, "[t]he remedies provided by this act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this act or by other rule of law."

Valley Trout asserts that the trial court found that it had objected to the additional term. The finding in its entirety reads:

"7

"During the summer of 1977 the defendant advised the plaintiff that the 'late charges' referred to in Finding 7 [sic] was not a part of their 'agreement,' that the P.C.A., defendant's banker, would not consider 'late charges' in its financing arrangements with the defendant. *However, the defendant continued to order fish food, and the plaintiff continued to deliver fish food as set forth in Finding 4, and the plaintiff debited defendant's accounts with 'late charges' as plaintiff stated in Finding 7.*"

The conclusions of law do not refer to this finding other than that the findings do not support the conclusion that there was an express contract for the imposition of late charges. Implicit from the court's finding of fact is that Valley Trout waived its objection to the term by continuing to order and receive fish food. Valley Trout continued to be charged with the late

charge but no other objection was forthcoming until after suit was filed by Rangen.

The case law does not address what is sufficient notice of objection under this section of the code. The cases dealing with the issue have involved written notice. *Valley Trout relies on S.C. Gray v. Ford Motor Co.,* 92 Mich.App. 789, 286 N.W.2d 34 (1979), as support for its position that oral notice is sufficient. In that case, however, the oral notification was followed by written objection within six days. Assuming, without deciding, that the oral notification was sufficient, a question remains whether that notification is effective forever and whether it may be waived either by conduct or by words.

The code should be read as a whole to effectuate its policies. I.C. § 28–1–103 provides that the common law is not abrogated by the code and reads as follows:

"28–1–103. Supplementary general principles of law applicable.—Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

Therefore, the principles of waiver and estoppel may still be considered in a commercial transaction.

In *Brand S. Corp. v. King Logging Co.,* 102 Idaho 731, 639 P.2d 429 (1981), we stated that waiver is the voluntary, intentional relinquishment of a known right, or advantage, and does not necessarily depend on any new consideration; it must appear, however, that an adversary party has acted in reliance upon such a waiver and altered his position.

■ Valley Trout's actions in continuing to order and pay for feed constituted a waiver of their right to object to the additional term. Valley Trout also paid the finance charge on one occasion after July, 1977. This conclusion is supported by the trial court's finding that Valley Trout continued to order fish food. The testimony by Mr. Ellis, Valley Trout's president, further supports this conclusion. We quote from his testimony:

"Q. Subsequent to July 1st, 1977, did you have any meetings with Thorleif Rangen to discuss the imposition of the one percent finance charge?

A. I did not think we were going to have the one percent. And some time after August 25 I spoke again with someone from Rangen's that came to the office. I believe it was Jeff Arnold. Could have been Gary Whitwell. And I also spoke with Mr. Rangen in his office, but I didn't think that was an imposition that we had agreed not to pay. And—but he did not agree at that time that we were not going to pay it. He left it on the account.

Q. *Okay. And didn't you, in fact, instruct Mr. Jerry Hawkins to pay the late charge that Rangen, Inc., imposed on that account?*

A. Yes.

Q. And that was subsequent to the July 1977 Billing; is that correct?

A. I think it was subsequent to the August. I don't think we were billed in July—a late charged in July. I'm not sure, but I don't think so.

. . . .

Q. Did you have any conversations with Rangen employees or Mr. Rangen himself after July 1, 1977, concerning the fact that you were being charged finance charges on your monthly billings that you had received from them?

A. Yes.

Q. And who did you have conversations with?

A. With Mr. Rangen and with Mr. Whitwell.

Q. And when did you have a conversation with Mr. Rangen?

A. It would have been after August 25th. Somewhere around in September.

Q. Of '77?

A. It would have been of '77.

Q. Can you tell the Court what the nature of that conversation was?

A. Just that I did not feel that it was part of the agreement, that we never came to any terms on interest.

Q. What did Mr. Rangen say?

A. He said that we would be charged interest, and we were charged interest.

Q. Did you after that time keep paying on your account?

A. Yes.

Q. Did you keep purchasing the feed from Rangen's?

A. Yes.

Q. Why did you do that?

A. In the fall of '77 you mean?

Q. Yes.

A. You have to feed the fish. There is only one place to get the fish feed in the valley.

. . . .

Q. But you were told by Mr. Rangen that in fact the late charge would be at the rate of one percent per month; were you not?

A. No. He just said you have to pay the finance charges. He didn't say the amount. I don't recall him ever saying the amounts.

. . . .

Q. Okay. But after Mr. Rangen told you that the finance charge would be imposed on your account in August or thereabouts, August of 1977, isn't it true that you ordered several hundred pounds of fish feed after that date?

A. Yes.

Q. And is it not true that you instructed your bookkeeper at that time to pay the finance charge that was being imposed by Rangen, Inc.?

A. Yes, I did.

. . . .

Q. But they did know that it was being imposed?

A. Interest rate, yes. They did know it was being imposed.

Q. And did you know it was being imposed?

A. Yes.

Q. And you continued to buy the feed?

A. That's right.

Q. And continued to feed the fish?

. . . .

Q. Now, going back to page 36, line 17, I asked the question [referring to Mr. Ellis' deposition]: 'Q. Well, is it your understanding then that you would have to—that you would have continued to pay one percent per month up until the time that you built your own feed mill?

'A. It was my intention that my fish had to be fed and the only way I could feed them was to pay the one percent.' "

The record contains ample evidence that Valley Trout intended to waive its right to object to the term. Valley Trout was aware that the interest rate was being charged and that Rangen would refuse to sell to it unless it agreed with those terms. The trial court's finding no. 7 is supported by substantial and competent evidence and will not be disturbed on appeal. From that finding and review of the record before this court, it can only logically be concluded that Valley Trout waived its previous objection to the late charges.

The record also indicates that Rangen was borrowing money at a rate of 1% above prime because of delinquent accounts. Rangen continued to sell to Valley Trout relying to its detriment on Valley Trout's acquiescence. By continuing to order and accept the fish food Valley Trout waived its objection to the additional term, the imposition of the late charge.

It is to be recalled that the code is to be construed as a whole to effectuate its purposes and policies. I.C. § 28–1–201, *supra.*

Section 28–1–205 provides:

"28–1–205. Course of dealing and usage of trade.—(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or

trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.
. . . ."

28–2–208 provides:

"28–2–208. Course of performance or practical construction.—(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

(2) The express terms of the agreement with any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (section 28–1–205).

(3) Subject to the provisions of the next section on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."

Under I.C. § 28–2–208, Valley Trout was aware of the nature of the expected performance, and that Rangen would impose the late charge if the account was not paid on time, and acquiesced in it without objection after that time. After the conversation in which Mr. Ellis said that the late charge was not part of the agreement, Rangen said it would be imposed; it was imposed, and Valley Trout continued to order food and on one occasion instructed its bookkeeper to pay the finance charge. Construing the express terms of the agreement and the course of performance as consistent with each other, Valley Trout was obligated to pay the late charge. Although Valley Trout only paid the late charge on one occasion, it was aware that Rangen would only sell the feed if the late charge was imposed on the delinquent account, as evidenced by Mr. Ellis' testimony. By continuing to order and purchase feed with knowledge of the term, Valley Trout agreed to pay the late charge.

Attorney fees on appeal would be covered by the provision in the invoice. This case being remanded, any award of attorney fees by the trial court should also encompass fees on appeal.

The judgment of the trial court determining the amount due for sale of goods is affirmed. That portion pertaining to computation of the late charge is reversed and remanded for further proceedings in conformance with the views expressed herein.

Costs to respondents.

The petition for rehearing is denied.

DONALDSON, C.J., SHEPARD and BISTLINE, JJ., and McQUADE, J. Pro Tem., concur.

BISTLINE, Justice, concurs in Part I only and dissents in Parts II and III.

PART II

In upholding the trial court's rejection of evidence offered to show Rangen's financing practices with other customers, mention should be made of *Cox v. Mountain Vistas, Inc.,* 102 Idaho 714, 719, 639 P.2d 12, 17

(1981), wherein it was recognized that in *Allen Street Supply Co. v. Bradley,* 89 Idaho 29, 402 P.2d 394 (1965):

> "[T]he court upheld the trial court's ruling denying the admission of exhibits of transactions between one of the parties to the action and third parties because 'the offered exhibits did not tend to prove or disprove facts relevant to the issues presented by the pleadings.' 89 Idaho at 37, 402 P.2d at 398."

This, to my mind, was sound law, but if one accepts the statement of *Cox* following the above excerpt, which reads:

> "In the instant case the evidence of the third party transactions as reflected in the testimony of the two witnesses does not render the inference more probable that respondent Crandlemire dealt truthfully with the appellant in making representations about the property than it would be without admission of the offered testimony." 102 Idaho at 719, 639 P.2d at 17.

then, applying the converse of that rule (which smacks of the federal rule that has yet to be adopted in Idaho), it would seem germane to the issues here at stake was evidence that Rangen did not charge other customers 12% and 18% on late payments. I would likely concur on the basis of *Allen Street,* but hesitate to do so in view of what was written in *Cox,* such being the Court's latest pronouncement. The trial bench and bar are entitled to ply their profession with more consistency on the part of this Court. Where the Court's opinion relies upon and excerpts comment 5 to I.C. § 28–2–207,[1] it would seem that there could not be more appropriate evidence as to "the range of trade practice" than Rangen's credit relationships with other customers.

## PART III

On the issue of materiality, discussed at length in the Court's opinion, I am more persuaded by the views of District Judge Cunningham, who wrote:

> "[I.C. § 28–2–207 provides] that additional terms (12% or 18% interest rate) become part of the contract unless 'they materially alter it.' In this particular case such additional terms materially alter the contract to sell fish at a particular price on open account due and payable the 10th of the month following purchase. Our law allows 8% interest on open accounts beginning three months after the last item. Our law in this regard became part of the parties' contract. To change the interest rate of that contract from 8% to 12% or 18% is a material alteration. In this case it would alter the amount of interest from approximately $1,400 to approximately $27,000—a substantial alteration in anyone's view."

It is important to remember that the case *was* tried, and Judge Cunningham entered his decision by way of the requisite findings of fact and conclusions, not the least important of which was his *factual* determination that the alteration at issue was a substantial one.[2] "Substantial" to my mind is even a greater degree than "material." A "material" alteration could take place and still might not raise to being "substantial." Unless an appellate court can say that the evidence does not support the findings, or that the findings and applicable law mandate a contrary legal conclusion, it is not at liberty to interfere. Here the Court's opinion does not allow itself to be concerned with examining the evidence to see if it supports the finding of Judge Cunningham, but sees his misapplication of I.C. § 28–2–

---

1. "Examples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given are . . . a clause providing for interest on overdue invoices or fixing the seller's standard credit terms where they are within the range of trade practice and do not limit any credit bargained for . . . ."

2. The materiality issue appears to have been decided only on Rangen's motion to amend the findings and conclusions. Rangen's complaint sought recovery on the running account "together with the amount of interest proved at the time of trial." Judge Cunningham's opinion states his findings and conclusions on the issue thus isolated, based on the evidence presented. Judge Cunningham's opinion is appendixed.

207(2)(b), which is said to follow from the Court's "interpretation" of that provision—a rationale which I do not readily understand, unless reference is intended to the view of the drafters which appears later in the opinion. It is said that comment 5 to § 28–2–207 is persuasive as to the error in Judge Cunningham's logic, and that two cases from Rhode Island and one from Kansas support comment 5 and the Court's matter-of-law conclusion. The *McKendall Lumber* case from Rhode Island, however, seems to fortify the view that today we should be upholding Judge Cunningham. The lower court there upheld the validity of the alteration, based on its view of the evidence:

> " '[t]he various documents that are in evidence of Plaintiff's # 1 [including the delivery receipts] are in very clear letters and have heavy lettering in some areas, and it speaks for itself. It states, "All past due accounts are subject to a one and a half percent finance charge," and that is heavily printed which is an annual percentage rate of 18 percent, and that is very heavy. I think that is the largest letters that appear on these documents, and that—[A]nd then they go way back over a period of time. There are some that have defendant's signature, and the Court is ruling that in the accepting of the delivery of these items he agreed to be bounded [sic] by the terms as set forth in this document. *No question in the Court's mind that he knew they were supposed to be paid.*' (Emphasis added.)" 425 A.2d at 518.

The Supreme Court of Rhode Island declared it to be "clear from the record that such findings were not clearly wrong and that the trial justice, in reaching these conclusions, did not overlook or misconceive material evidence," 425 A.2d at 518, and affirmed. The later Rhode Island case upon which the Court relies, *Tim Hennigan Co.*, merely sheds light on *McKendall Lumber Co.*, of which it states that its holding there was that "interest terms on delivery receipts become part of a contract under the conditions set forth in .... § 6A–2–207 of the Uniform Commercial Code even if seller accepts by shipping conforming goods." 437 A.2d at 1357 (footnote omitted).

Seeing but little applicability of the Rhode Island cases to the case before us, I can find no applicability of the third case, that from the Kansas Court of Appeals. As in the *McKendall Lumber* case, no issue of materiality is therein discussed; rather the court there merely held the trial court correct in applying 6% and 10% interest to prejudgment accounts—done pursuant to an invoice clause reciting that after maturity interest would be charged on the amount of the bill.

The Court then states, however, in explanation of its reliance on comment 5 and the three cited cases for support of its matter-of-law conclusion of immateriality, that a cross-reference in the comment to § 28–2–207 to § 28–2–718 brings liquidated damages into play, and somehow fortifies the attained conclusion that the drastic alteration of the interest was immaterial. If I understand the Court's hypothesis in this vein, it is that a debtor who is not expected to pay his account on time can be charged 12% to 18% "service charges," and, again as a matter of law, the same "are reasonable, in light of the anticipated or actual harm caused by the breach (of not paying on time)." A difficulty in comprehending the Court's rationale is that unless my powers of reading and recollection are dimmed, neither party, and especially not Rangen, urged this upon the Court either in briefing or at oral argument. Yet four members of the Court see this as no problem and apparently do understand and agree that interjection of a discussion of liquidated damages makes reasonable the possible assessment of interest rates at 1% and 1½% per month. It is difficult to understand. Lending institutions in the past few years have not had to so resort in making similar charges. The cost of money has been rather well-fixed at the rates involved, and the sole issue here was thought to be that of material alteration in a contractual arrangement between merchants. Obviously one merchant can charge and another can

pay or agree to pay 18%. The question, however, is whether such was here done pursuant to an implied or express agreement. On appeal Rangen's thrust is acquiescence by Valley Trout—from which it is gathered that it contends, as it may properly do, that the evidence does not sustain the findings. Admittedly there is merit in the argument—but it is too well established that "meritorious" arguments alone will not suffice to overturn a trial court's findings if based on substantial evidence, evidence which it alone has heard and weighed.

The Court's opinion sets out Finding No. 7 made by Judge Cunningham.[3] From this finding the Court's opinion, after noting that Judge Cunningham concluded the parties had no express agreement for the imposition of late charges[4]—in what might be called a classic example of appellate literary license—declares that "[i]mplicit from the [trial] court's finding of fact is that Valley Trout waived its objection to the term by continuing to order and receive fish food." I cannot accept the Court's intuitive expertise in attributing to Judge Cunningham that which he was very capable of saying had he chosen to do. Having decided for Judge Cunningham that which Judge Cunningham intended but was apparently unable to articulate, the Court then points to testimony which is said to sustain Valley Trout's alleged waiver of their objection— even to the point of declaring outright that "the record contains ample evidence that Valley Trout intended to waive its right to object to the terms." Again, I would say, having had almost six years of reading Judge Cunningham's findings, conclusions, judgments, orders, and memorandum decisions, if he had found waiver as a fact established by the evidence, he would not have hesitated to say so. On the other hand, the testimony recounted in the Court's opinion is equally capable of being understood that Rangen had a somewhat impoverished Valley Trout between a rock and a hard place. Objecting to the greatly increased interest charges to which it never agreed, it nevertheless had to mollify Rangen in order to get the feed needed to continue in business.[5] There are many instances where money is paid under duress and not because of a promise to do so. It happens daily to taxpayers. Believing that the Court in its appellate finding of waiver has usurped the function of the trial court, and understanding that it is done in the name of the U.C.C. and its holy shroud of uniformity, I take some comfort from the brief of Rangen:

> "When the Idaho Legislature adopted the U.C.C. they adopted its philosphy as well as its language, its special meanings as well as its ordinary words. Although hopelessly riddled with such imprecise standards as good faith and commercial reasonableness, see e.g., Idaho Code § 28–1–203, the U.C.C. attempts to reflect and facilitate modern commercial activity."

To this I add that the legislature not only adopted the U.C.C. but mandated, for the sake of uniformity, that attainment of uniformity be realized in the Idaho courts by subjugating logic and common sense to interpretations of the code made in other jurisdictions. Thus, in *Whitworth v. Krueger,* 98 Idaho 65, 558 P.2d 1026 (1976), the Court upheld the award of Krueger's

---

3. For convenience, I set it out here, absent the underscoring which was added in the Court's opinion:

> "During the summer of 1977 the defendant advised the plaintiff that the 'late charges' referred to in Finding 7 [sic] was not a part of their 'agreement,' that the P.C.A., defendant's banker, would not consider 'late charges' in its financing arrangements with the defendant. However, the defendant continued to order fish food, and the plaintiff continued to deliver fish food as set forth in Finding 4, and the plaintiff debited defendant's accounts

with 'late charges' as plaintiff stated in Finding 7."

4. Conclusion "G" of Judge Cunningham in full was that Findings 3, 4, 5, 6 and 7 will not support the legal conclusion that there was ever an express contract in writing, or otherwise between the parties for the payment of "finance charges," "late charges" or interest on money due on account.

5. "MR. ELLIS: It was my intention that my fish had to be fed and the only way I could feed them was to pay the one percent."

cattle to Whitworth (there being no relationship of any kind between Whitworth and Krueger other than that they both dealt with Cammack), notwithstanding a recorded agreement of bailment between Krueger and Cammack, actually penalizing the Kruegers for supposed noncompliance with a code provision which as applied forfeited the Krueger cattle to the Whitworths who were unjustly enriched at Krueger's expense—all of which is readily available beginning at page 85 of 98 Idaho, and page 1046 of 558 P.2d, and need not be repeated. Worthy of repetition, however, and sharing with Rangen that candid view exemplified in the excerpt from Rangen's brief, I repeat this passage from my dissenting opinion in *Whitworth,* with which I close:

> "Unfortunately, the majority is more in awe of the Code than were its drafters who, according to Professor Gilmore, never intended that its enactment would
>
> '... announce the arrival of the millenium. The Code is, in my opinion, a good statute; it is not a perfect one. I see nothing to be gained, and much to be lost, by a pretense that it is either more or better than it is.'
>
> I Gilmore, Security Interests in Personal Property, Preface, at x (1965)."

"Professor Gilmore notes that it is the *explicit* policy of the Code that it not be applied blindly and mechanically.

> 'The present point is that the Uniform Commercial Code, so-called, was not designed, as the European Codes may have been, to abolish the past, even on the level of semantics or vocabulary. In a provision which reproduces in slightly different form one found in all the earliest Uniform Acts in the commercial field, the Code says (1–103):
>
> " 'Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

> " 'Even on its own terms, then, *the Code does not purport to contain all the law there is....*
>
> " 'Answers will be provided to questions such as these. Many of the answers will come in the form of amendments to the present text of the Code. *Others will come from the more leisurely process of judicial decision.* Paradoxically, it is at this point—in devising appropriate solutions to problems that have only recently become identifiable—that a knowledge of the past becomes most helpful, both to the legislative draftsman and to the judge.' Ibid. at viii–ix." 98 Idaho at 85, 558 P.2d at 1046–47.

Were the Court today to apply the foregoing philosophy expounded by Professor Gilmore, and simply apply Idaho law, it would seem inevitable that the decision of Judge Cunningham would be left standing—notwithstanding that perhaps most members of this Court if sitting as a trial court might have found on the evidence in favor of Rangen. Judge Cunningham, trier of the facts, did not.