## Equipment Finance, Inc. *v.* Grannas et al., Appellants.

Argued December 15, 1965.  Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, and HOFFMAN, JJ. (FLOOD, J., absent).

*T. Dean Lower,* for appellants.

*Martin Goodman,* with him *Alexander A. Notopoulos,* and *Goodman & Notopoulos,* for appellee.

OPINION BY JACOBS, J., March 24, 1966:

The narrow point of law presented in this appeal is whether or not the Usury Statute applies to a sale of heavy machinery on credit when a finance company, in good faith and for value, purchases from the seller of the machinery the security agreement and accompanying note given by the buyer to the seller.

Equipment Finance, Inc., hereinafter called "Finance Co.", sued Chester E. Grannas and Paul A. Grannas, trading as Grannas Brothers, a partnership, hereinafter "Buyer", to recover three monthly payments allegedly due on the purchase of certain rock crushing equipment from Aggregates Equipment, Inc., hereinafter "Seller".  In October, 1963, a jury returned a verdict of $8,062.31 for the Finance Co., which included the three monthly payments of $2,133.02 monthly, plus interest from 1959.  Buyer appeals from the judgment entered on the verdict.

The main issue at trial was whether the transaction was a loan from Finance Co. to Buyer so arranged as

to constitute a subterfuge to avoid the law against usury, as alleged by appellants, or a sale on credit with an assigned installment sales agreement. This was resolved against appellants. Since the parties have stipulated for this court that the transaction was a sale on credit and that Finance Co. purchased the security agreement and accompanying note from Seller in good faith and for value, we need not go into the involved factual details.

For purposes of this appeal it is sufficient to point out that Buyer and Seller executed a security agreement dated July 9, 1956, covering the rock crushing equipment which Seller sold to Buyer. The security agreement clearly delineated each component of the selling price. It showed an unpaid cash price of $65,-075.28, which included an insurance charge of $2,099.28 and a $5.00 filing fee. It showed a time balance of $76,-788.72, arrived at by adding a "credit service charge" of $11,713.44 to the unpaid cash price. It set forth the terms under which the time balance was to be paid, viz., 36 monthly installments of $2,133.02 each, beginning August 9, 1956. Seller assigned this security agreement and Buyer's accompanying note to Finance Co. in return for the unpaid cash price less insurance and filing charges. Buyer made each month's payment to Finance Co. for 33 months but refused to pay the final three installments, tendering instead a check for $396.92, which it alleged was the entire balance due at the time the 34th payment was demanded in May, 1959. It contended that the credit service charge of $11,713.44 was usurious and that all it was obliged to pay was 6% interest per annum on the declining balance of the unpaid cash price, leaving $396.92 due.

Appellants would have us hold that certain sections of Article 9 of the Uniform Commercial Code, Act of April 6, 1953, P. L. 3, §9-101 et seq., as amended, 12A P.S. §9-101 et seq., hereinafter "the Code", show the

intention of the legislature to make this transaction a loan, requiring an application of the Usury Statute. We cannot agree.

The Usury Statute, Act of May 28, 1858, P. L. 622, 41 P.S. §3, provides:

"The lawful rate of interest for the loan or use of money, in all cases where no express contract shall have been made for a less rate, shall be 6% per annum . . ." Courts in this jurisdiction have consistently said that this act does not apply to a bona fide sale of goods on credit. Such sales are the result of a decision by a buyer to purchase property on credit at a higher price than he would pay if he paid cash. There is no loan or use of money on the part of the buyer. In *Melnicoff v. Huber Investment Company,* 12 Pa. D. & C. 405, 408 (1929), the court said:

"Summing up the matter, the law seems to be settled that usury can only attach to a loan of money or to the forebearance of a debt and that on a contract to secure the price or value of work, the labor done or to be done or property sold, the contracting parties may agree on one price if cash is to be paid and upon as large an addition to cash price as may suit themselves if credit be given, and it is wholly immaterial whether the enhanced price is ascertained by the simple addition of a lumping sum to the credit [sic] price or by a percentage thereof." This case was cited with approval in *Equitable Credit & Discount Co. v. Geier,* 342 Pa. 445, 21 A. 2d 53 (1941), and in *Personal Discount Co. v. Lincoln Tire Co.,* 67 Pa. D. & C. 35 (1949). In the former case our Supreme Court said, at p. 455:

"Of course, all sale or lease contracts which extend credit are, to a certain extent, akin to the making of loans, but where a greater charge is exacted in the case of a sale on credit than in a cash sale it is included in the selling price of the article. It being uniformly held that sellers are free to contract with buyers as

to the terms and conditions of sales, the financing of sales of merchandise by the extension of credit has never been considered subject to the prohibition of usury or to regulations applicable to banking and loan transactions."[1]

A careful review of the testimony and of the law of Pennsylvania satisfies us that prior to the Code this transaction would not be regarded as usurious. We agree with the jury's conclusion that even though a finance company was involved, taking an assignment of the security agreement, the primary purpose of this transaction was the purchase of goods and was not an occasion or pretext for a loan.[2]

With the law thus established, the only inquiry remaining for us is to consider appellants' argument that Article 9 of the Code changes the law since a security agreement was executed here. We think not.

Appellants first rely on Section 9-201, which provided at the time this transaction occurred:

"Except as otherwise provided by this Act or by other rule of law or regulation, a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors. Nothing in this Article validates any charge or practice illegal under any rule of law or regulation governing usury, small loans, retail installment sales, or the like, or extends the application of any such rule

---

[1] Annotations in 48 A.L.R. 1442 and 57 A.L.R. 880 collect numerous cases from other jurisdictions which follow the rule that usury cannot be predicated upon the fact that property is sold on credit at an advance in price over what would be charged in case of a cash sale, so long as it appears that the price charged is in fact fixed for the purchase of goods on credit with no intention or purpose of defeating the usury laws. See also 91 A.L.R. 1105 and 143 A.L.R. 238.

[2] The Supreme Court of Delaware, applying Pennsylvania law, reached the same result after considering similar arguments in *Langille v. Central-Penn National Bank,* 156 A. 2d 410 (1959).

of law or regulation to any transaction not otherwise subject thereto."

This section does not help appellants because we are not presented with a situation involving a "charge or practice illegal under any rule of law or regulation governing usury." This sale on credit with its mutually agreed upon financing arrangement was not illegal under Pennsylvania law, as we have seen.

Appellants next cite the Comments to Section 9-107, which defines a purchase money security interest. These comments, as cited by appellants, read as follows:

"Under this section a financing agency has a purchase money security interest when it advances money to the seller, taking back an assignment of chattel paper, and also when it makes advances to the buyer (e.g., on chattel mortgage) to enable him to buy, and he uses the money for that purpose. To eliminate difficulties of tracing, a conclusive presumption is established that money advanced to a buyer ten days before or after receipt of the collateral is a purchase money loan whether or not such money was in fact used to pay the price if the purpose of the advance was to enable the debtor to acquire the collateral."

These comments do not help appellants because they are merely an attempt to clarify the Code's definition of a purchase money security interest, explaining (a) when a financing agency has a purchase money security interest, and (b) when money *advanced to a buyer* is a purchase money loan. Since no money was advanced to a buyer here and no one questions the existence of a purchase money security interest, we cannot apply these comments, even if they were given the weight of law, to convert a credit sales transaction into a loan.

Likewise, appellants' scattered references to other portions of Article 9 of the Code have no bearing on

this case. Nowhere in this article, which is a comprehensive scheme for the regulation of security interests in personal property, is any attempt made to regulate financing charges. This Buyer agreed to pay a higher price for the rock crushing equipment for the privilege of buying it on credit and using it while paying it off. He elected to enter into this financing agreement rather than attempting to secure a loan through a bank for reasons not here our concern.[3] Neither Article 9 of the Code[4] nor the public policy arguments advanced by appellants convince this court that we should or can change the financial agreement these businessmen entered into. The latter arguments are more properly addressed to the legislature which has imposed restrictions to cover certain financing situations, as in the Small Loan Act of June 17, 1915, P. L. 1012, as amended, 7 P.S. §751 et seq.; the Consumer Discount Company Act of April 8, 1937, P. L. 262, as amended, 7 P.S. §761.1 et seq.; and the Motor Vehicle Sales Finance Act of June 28, 1947, P. L. 1110, 69 P.S. §601 et seq. Absent legislative action to regulate the financing of large commercial transactions between businessmen, we will leave these businessmen, who are presumed to know what they are doing when they consummate equipment purchase agreements, to their bargain.[5]

Order and judgment affirmed.

---

[3] There was testimony at trial that appellants were reluctant to "tie up their borrowing capacity" at a bank that would require two and a half or three times the collateral.

[4] Even this article distinguishes between buyers of equipment, as this Buyer was, and buyers of consumer goods (see Section 9-109) and is more protective of the latter, as in Section 9-206.

[5] We note that if appellants had been a corporation instead of a partnership, the Act of May 5, 1933, P. L. 364, art. III, §313, 15 P.S. §2852-313, would prevent their use of the defense of usury.