Tito POLLICE and Violet Pollice, et al., Plaintiffs,

v.

NATIONAL TAX FUNDING, L.P. et al., Defendants.

Gladys Houck, et al., Plaintiffs,

v.

Capital Asset Research Corp. Ltd., et al., Defendants.

No. CIV.A. 98–813.

United States District Court, W.D. Pennsylvania.

July 29, 1999.

**476**

Rudy A. Fabian, Donald Driscoll, for Plaintiffs.

Terrence C. Budd, for Nat.Tax Fund; Cap.Asset.

Ira Weiss, Pittsburgh, PA, for School Dist. of Pittsburgh.

Ronald H. Pferdehirt, Pittsburgh, PA, for City of Pittsburgh.

Christopher C. French, Pittsburgh, PA, for Cap.Asset; National Tax Funding; Capital Assets Holding.

*OPINION*

ZIEGLER, Chief Judge.

Pending before the court are the cross-motions for summary judgment (doc. nos.77, 85) of defendants, National Tax Funding, L.P. ("National Tax"), Capital Asset Research Corp. Ltd. ("CARC"), and Capital Assets Holdings GP, Inc. ("Capital Assets"), and plaintiffs, Gladys Houck, Marie Demitras, Bragette Parker, Mary Walsh, Mary Tabb, et al. ("Houck plain-

tiffs"), pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. National Tax seeks summary judgment in both the Houck action and the action concerning representative plaintiffs Tito and Violet Pollice ("Pollice plaintiffs").

### I. *Facts*

National Tax is the purchaser of certain liens and claims arising out of delinquent real estate taxes, water rate charges, and sewer charges previously owned by the City of Pittsburgh (the "City")[1] and the School District of Pittsburgh (the "School District"). National Tax purchased the liens and claims through a purchase agreement dated September 30, 1996. The agreement provides that the City and School District each:

> does hereby sell, assign, transfer and convey ... its interest in the tax and municipal claims listed on the attached Schedule A, including interest, penalty and costs thereon, as permitted by law, together with all benefits and advantages that may be obtained thereby.

Defs.' Mot. for Summ. J., Ex. 11.

National Tax entered into a similar purchasing agreement with the Pittsburgh Water and Sewer Authority (the "PWSA") in April, 1997. Both the agreement with the City and School District and the agreement with the PWSA provide for the purchase of future liens by National Tax.

Under the purchase agreements with National Tax, the City, School District, and PWSA retained the right to service the liens. This right was subsequently granted to CARC·by each of the respective organizations.

Pollice plaintiffs commenced this civil action alleging, *inter alia*, violation of the Truth In Lending Act (the "TILA"), 15 U.S.C. § 1601 *et seq.* The Pollice plaintiffs

---

1. The City assigned National Tax both tax claims and sewer claims. The sewer claims had been acquired by the City from the Allegheny County Sanitary Authority ("ALCOSAN"), pursuant to the terms of a 1955 agreement providing for the City to make regular ongoing purchases of unpaid sewer claims. To the extent that we refer to the City as the original owner of such liens and claims in the content of this opinion, we do so for the sake of simplicity only, as it does not otherwise affect our analysis of the case.

TILA claim rests on the allegation that defendants offered to extend credit to plaintiffs for the payment of delinquent real estate taxes and unpaid water and sewer charges. The Pollice plaintiffs also assert claims under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, and Pennsylvania common law.

Representative plaintiffs Gladys Houck, Marie Demitras, Bragette Parker, Mary Walsh and Mary Tabb brought a civil action alleging violations of the Fair Debt Collection Practices Act (the "FDCPA"), 15 U.S.C. § 1692 *et seq.* (1998), the Unfair Trade Practices and Consumer Protection Law (the "UTP/CPL"), 73 P.S. §§ 201–1 through 201–9.2 (West 1993), and the Loan Interest and Protection Law (the "LIPL"), 41 P.S. § 101 *et seq.* (West 1992).[2] The Houck action is related to the Pollice action and the two have been treated together.

## II. *Standard of Law*

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, we must examine the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. *Discussion*

### (A) *Loan Interest Protection Law (Houck Plaintiffs)*

The Pennsylvania Loan Interest Protection Law prohibits the charging and collection of interest and other charges for the loan or use of money which exceeds that "provided [for] by this act or otherwise by law." 41 P.S. § 501 (West 1992). The LIPL authorizes a maximum lawful interest rate of six percent for the loan or use of money, absent statutory authority to charge a higher rate. *Id.* at § 201. It has been alleged that the Municipal Claims Act serves as statutory authority allowing for a charge of a 10% rate.[3] Houck plaintiffs argue that, regardless whether the applicable rate is six or 10%, defendants have violated the LIPL by charging and collecting an interest rate of between 18% and 19.5% per annum.

Defendants counter that two main factors prevent the LIPL from applying to them. First, they argue that the interest limitations of the LIPL and the Municipal Claims Act have been superseded by the Home Rule Charter and Optional Plans Law, 53 Pa.C.S.A. § 2901 et seq. (West 1997), and the amount of interest and penalties that they have been charging is authorized by the Home Rule Charter Law. Second, defendants contend that, even absent specific Home Rule Charter authority to charge the rates assessed, they are not violating the LIPL, as the withholding of

**2.** Plaintiffs' second amended complaint also asserts claims for violations of the Due Process Clause of the United States and Pennsylvania Constitutions (count I), and violations of the Pennsylvania Second Class City Treasurer's Sale and Tax Collection Act, 53 P.S. § 27101 *et seq.* (West 1998)(count II). On or about October 30, 1998, we approved a settlement with respect to counts I and II of the second amended complaint. Further, a claim for violations of the Pennsylvania Municipal Claims and Tax Lien Law (the "Municipal Claims Act"), 53 P.S. § 7101 *et seq.* (West 1997), asserted at count III of the second amended complaint, was dismissed by this court through an order dated November 25, 1998.

**3.** Although we have not specifically been asked to address this issue, we find that the 10% maximum rate set forth in section 7143 of the Municipal Claims Act is appropriate. This is particularly the case in light of the Pennsylvania Commonwealth Court's holding in *Maierhoffer v. GLS Capital, Inc.*, 730 A.2d 547 (Pa.Cmwlth.1999), in which the court held that municipal and tax liens are assignable. As the Municipal Claims Act provides that a rate of 10% may be charged, and as the court in *Maierhoffer* held that the liens may be assigned, we hold that the 10% rate may be charged by National Tax on the assigned liens and claims.

payments owed to National Tax by plaintiffs 'does not constitute a "use of money" for the purposes of the LIPL.

1. Does the Home Rule Charter authorize the charge of higher rates of interest and penalty?

Section 604 of the Loan Interest Protection Law provides:

If any maximum lawful rate of interest provided for in this act is inconsistent with the provision of any other act establishing, permitting or removing a maximum rate, or prohibiting the use of usury as a defense, then the provision of such other act shall prevail.

41 P.S. § 604 (West 1992).

Defendants contend that the rate restrictions of the LIPL are therefore subject to an increased interest rate to the extent permitted under the Home Rule Charter Law. While the Houck plaintiffs do not argue that section 604 prohibits this type of rate increase, they respond that the Home Rule Charter Law does not establish the power to legislate concerning the collection of municipal tax claims or liens to the extent that such legislation is contrary to or enlarges powers granted by the Municipal Claims Act or other state statute.

The parties have stressed the relevance of two primary sections of the Home Rule Charter Law. Section 2962(a) reads, in relevant part:

With respect to the following subjects, the home rule charter shall not give any power or authority to the municipality contrary to, or in limitation or enlargement of, powers granted by statutes which are applicable to a class or classes of municipalities:

(1) The filing and collection of municipal tax claims or liens and the sale of real or personal property in satisfaction of them.

53 Pa.C.S.A. § 2962(a) (West 1997).

While the Houck plaintiffs contend that section 2962(a) is most relevant to the

instant proceeding, defendants argue that section 2962(a) is largely immaterial and that section 2962(i) is controlling. Section 2962(i) provides:

No provision of this subpart or any other statute shall limit a municipality which adopts a home rule charter from establishing its own rates of taxation upon all authorized subjects of taxation except those specified in subsection (a)(7).

53 Pa.C.S.A. § 2962(i) (West 1997).

We hold that the plain language of the statute requires application of section 2962(a) to the instant action. As Houck plaintiffs note, "the power to set tax rates on property is distinct from the power to determine matters relating to the collection of unpaid taxes." Br. in Supp. of the Houck Pls.' Mot. for Summ. J. and in Opp'n to Defs.' Mot. for Summ. J., at 9. The General Assembly expressly provided in section 2962(a) that state law governs the subject of tax claim collection. Here, defendants are controlling the rate of interest and penalty, and not the rate of taxation. We hold that rates of interest and penalty fall within the ambit of tax claim collection for the purposes of the Home Rule Charter Law.

Defendants, citing *McSwain v. City of Farrell,* 154 Pa.Cmwlth. 523, 624 A.2d 256, 258 (1993), argue that section 2962(a)(1) is properly interpreted as applying only to municipal tax claims or tax liens. Granting defendants the benefit of *McSwain,* however, provides no comfort. First, while section 2962(a)(1) may not apply to water and sewer liens, it is, in our judgment, unquestionable that the section applies to the tax liens at issue. Second, assuming that section 2962(a)(1) does not explicitly apply to water and sewer liens, there is no other provision in the Home Rule Charter Law which permits a municipality, which has adopted a home rule charter, to increase the maximum rate of interest and penalties on such claims.

Indeed, even if we were to conclude that section 2962(a) is inapplicable, section 2962(i) does not contain language "establishing, permitting or removing a maximum rate, or prohibiting the use of usury as a defense," as is required under § 604 of the LIPL. Section 2962(i) fails to create an exemption for defendants from the 10% limitation of the Municipal Claims Act.

Section 2962(i) addresses a municipality's ability to set the rate of taxation. While defendants have explained in great detail the ties that exist between interest and taxation, we believe that the language of the Home Rule Charter Law precludes considering interest and penalties within a home rule municipality's authority to set "rates of taxation upon ... authorized subjects of taxation." "Rate of taxation" is defined in section 2902 of the statute as "[t]he amount of tax levied by a municipality on a permissible subject of taxation."[4] 53 Pa.C.S.A. § 2902 (West 1997). We see no reason to expand this definition beyond the scope adopted by the state legislature to include charges for interest and penalty within its coverage.

■■■ Indeed, in cases involving statutory construction of enumerated exceptions, courts often apply the interpretive canon *expressio unius est exclusio alterius.* Generally stated, this maxim provides that where a legislative body explicitly enumerates certain exceptions to a general prohibition, additional exceptions must not be implied unless there is evidence of a contrary legislative intent. *See Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980);

*Philadelphia & Reading Corp. v. United States,* 944 F.2d 1063, 1073 (3d Cir.1991). More precisely, the statutory tool has been interpreted as meaning that the "explicit mention of one thing in a statute implies a congressional intent to exclude similar things that were not specifically mentioned." *Collinsgru v. Palmyra Bd. of Educ.,* 161 F.3d 225, 232 (3d Cir.1998). Here, there is a general prohibition on a municipality's ability to set rates beyond the 10% authorized by the Municipal Claims Act. While the Home Rule Charter Law enlarges the municipality's power to set the rate of taxation, there is no mention of the municipality's right to set interest rates. *See Appeal of Gagliardi,* 401 Pa. 141, 163 A.2d 418, 419 (1960) (municipalities have no inherent powers and may do only those things which the legislature has expressly or by necessary implication placed within their power). We hold that the Home Rule Charter Law does not authorize defendants to charge a rate in excess of 10%.

■■■ Defendants also contend that their actions do not violate the 10% limitation set forth in the Municipal Claims Act, as a large portion of the finance charge assessed is not interest, but penalty. This distinction rings hollow when applied to the instant set of facts.[5] Neither defendants, nor any municipality, may evade the requirements of the Municipal Claims Act by converting interest in excess of that which is statutorily authorized to a "penalty." This is contrary to the clear meaning of the statute.[6]

---

4. "Subject of taxation" is defined as "[a]ny person, business, corporation, partnership, entity, real property, tangible or intangible personal property, property interest, transaction, occurrence, privilege, transfer, occupation or any other levy which is determined to be taxable by the General Assembly. The term shall not be construed to mean the rate of tax which may be imposed on a permissible subject of taxation." 53 Pa.C.S.A. § 2902 (West 1997).

5. Defendants have suggested no practical distinction between the "interest" charge and the "penalty" charge. In fact, CARC appears to have combined the two rates, labeling them "interest." *See* Rosenthal Aff., Attach. III.

6. In addition, as noted with respect to interest rates, there is no express language authorizing a municipality to set penalty rates in either the Municipal Claims Act or the Home Rule Charter Law, and we decline to expand the Act beyond its language. *See Appeal of Gagliardi,* 163 A.2d at 419.

We further note that our interpretation of the Home Rule Charter Law is supported by public policy. Without statutory authority, it is unconscionable for those owed a debt to charge an interest rate of almost 20% to individuals who incurred the debt through pursuit of the necessities of life and who are unable to afford the payments on the original debt. An interest rate of almost 20% serves less as a motivating factor to pay the debt and more as an encouragement to give up entirely. Thus, we are constrained to read the Home Rule Charter Law as allowing a charge no greater than that authorized by the General Assembly under the Municipal Claims Act and LIPL.

### 2. Scope of the "Loan or Use of Money" Requirement of the LIPL

■ The parties agree that the Loan Interest Protection Law applies only where there has been a loan or use of money. Defendants contend that the transaction at issue cannot be so characterized. Defendants argue that the extension of payment plans to plaintiffs does not give rise to plaintiffs' obligations. Rather, defendants urge that the relevant transactions existed from the time that the taxes or municipal charges became due. *See, e.g., In re Estate of Braun,* 437 Pa.Super. 372, 650 A.2d 73, 80–81 (1994).

Defendants argue that the time-price exception, under which a purchaser can bargain to pay a higher rate for goods or services in exchange for the right to pay in installments over time, applies here. We disagree. While defendants stress the applicability of the Pennsylvania Superior Court case, *In re Estate of Braun,* we find that *Braun* must be limited to the facts of that case.[7]

*Equipment Finance, Inc. v. Grannas,* 207 Pa.Super. 363, 218 A.2d 81 (1966), provides a more typical example of the time-price exception. There, the consumer purchased equipment on an installment contract at a significantly higher price than would have been paid for the equipment had the consumer paid in full at the time of purchase. The court held that:

> Courts in this jurisdiction have consistently said that [the usury] act does not apply to a bona fide sale of goods on credit. *Such sales are the result of a decision by a buyer to purchase property on credit at a higher price than he would pay if he paid cash.* There is no loan or use of money on the part of the buyer.

*Id.* at 82, 218 A.2d 81 (emphasis added).

The facts in the instant case make plain that plaintiffs, unlike the purchaser of goods in *Equipment Finance,* did not make a conscious decision to pay for the "goods" on credit at a higher rate rather than by a cash payment for a lower rate. Instead, the "sale" at issue here was intended to be a cash purchase, with the interest penalties now being computed against plaintiffs after the fact, as a result of their failure to make prompt payment,

---

7. *Braun* involved a financial obligation arising from the purchase of funeral-related goods and services. After the consumer was unable to pay the full payment price up-front, the funeral director filed a claim against the husband's estate. Such claim ultimately, by an adjudication of the court, became a lien on a piece of property which served as the entirety of the estate. As part of the adjudication, the consumer was required to make payments upon the debt, and the parties "expressly contracted for a post-judgment rate of interest in excess of the statutory rate, as they were permitted to do." *Braun,* 650 A.2d at 78. After making four payments under the new agreement, the consumer again defaulted. As permitted by the parties' agreement, the funeral home computed interest on the amount still owed at a rate of eight percent per annum rather than the six percent which was the maximum statutory rate allowable by law. The court upheld the greater interest rate as the case involved a bona fide purchase and as the parties had expressly agreed to the higher rate. *Id.,* 650 A.2d at 77–78 ("we do not believe that the transaction falls within the scope of matters which the LIPL was designed to regulate as it involved the bona fide purchase of and payment for funerary goods and services, which became a just debt of the estate, rather than an agreement for the loan or use of money.").

and without a contractual promise by plaintiffs to pay an interest rate beyond that authorized by the legislature. There is no evidence of clear disclosure, at the time of the "purchase," of the cash price as opposed to the cost of the "credit" purchase.

This does not end our analysis however. Many courts have found an exception to the usury laws for late payments. These courts have held that "[w]here the excessive interest is caused by a contingency under the lender's control, ... the transaction is usurious; [it is] otherwise when the contingency is under the borrower's control." *Abbot v. Stevens*, 133 Cal.App.2d 242, 284 P.2d 159 (1955). While the Pennsylvania state courts have not yet specifically considered this issue, we predict that the Pennsylvania Supreme Court would follow the majority of courts which have ruled on the issue. *See, e.g., Conway v. White Trucks, A Div. of White Motor Corp.*, 885 F.2d 90, 94–95 (3d Cir.1989).

In *Smith Mach. Co., Inc. v. Jenkins*, 654 F.2d 693 (10th Cir.1981), the Court of Appeals addressed the issue of whether a higher rate of interest charged after the maturity of a debt was subject to regulation by usury law. The court determined that where there was no agreement to defer payment after maturity, the failure to make payment was a "detention" of money, rather than a forbearance within the meaning of the New Mexico usury law. *Id.* at 696. Thus, the court determined that absent language in the state's usury law making the statute applicable to interest rates "on the 'detention' as well as the use of money," usury limitations on interest rates charged do not apply to post-maturity charges. *Id.*

Similarly, in *Widmark v. Northrup King Co.*, 530 N.W.2d 588 (Minn.Ct.App.1995), the state Court of Appeals concluded:

> [T]he [one and one half percent per month] "late charges" assessed by Northrup did not constitute a usurious rate of interest. Northrup never actual-

ly agreed to forego an immediate action on Widmark's account if it became overdue in exchange for a late charge. Unlike typical credit arrangements, Northrup did not encourage late payments in order to recover the additional charge.... Consequently, we hold that there was no forbearance here within the meaning of the usury laws. *See Rangen, Inc. v. Valley Trout Farms*, 104 Idaho 284, 658 P.2d 955, 960 (1983)(usury statutes inapplicable in absence of express agreement for seller to forego immediate demand for payment or action on the account); *Wilson v. Dealy*, 222 Tenn. 196, 434 S.W.2d 835, 837 (1968) (same).

*Widmark*, 530 N.W.2d at 591.

Further, the United States District Court for the District of Connecticut considered a case involving similar facts and reached the conclusion that the Connecticut usury law did not prohibit a creditor from imposing a monthly one and one-half percent charge on balances in arrears for over 30 days. *See Scientific Prods. v. Cyto Med. Lab., Inc.*, 457 F.Supp. 1373 (D.Conn.1978). The court first considered the transaction as if subject to the time-price exemption, and recognized that it did not fit that exemption. The court held, however, that "[t]he charge of 1½% per month interest on the balance remaining unpaid after 30 days is clearly a charge for non-payment. It was not a separate agreement to postpone collection in return for an additional consideration." *Id.* at 1378.

The court continued:

> [T]here was no agreement that the defendant could defer payment. Many cases have held that since charges of this nature are within the borrower's control, they are penalties for non-payment, rather than charges for the use of money, and, therefore, not affected by the usury laws.

*Id.* at 1379.[8]

In *Rangen Inc. v. Valley Trout Farms, Inc.*, the Idaho Supreme Court held that no forbearance occurs unless there is an express agreement or contractual obligation for the party to whom the debt is owed "to forego an immediate action on the account if it became overdue or to forego a demand for immediate payment." *Rangen*, 658 P.2d at 958. *See also Jenkins*, 654 F.2d at 696 (finding a "detention" of money rather than a forbearance because "there was no agreement that Jenkins could defer payment after maturity"); *Widmark*, 530 N.W.2d at 591 (finding that "Northrup never actually agreed to forego an immediate action on Widmark's account if it became overdue in exchange for a late charge," in determining there was no forbearance).

In the instant case, there was no express agreement when the initial charges were incurred. However, the payment plans provided by defendants contain precisely the type of agreement to forego immediate action that did not exist in *Rangen*. The plans provide, in relevant part:

> *I understand that if I default in the payment of installments as provided above,* or if I fail to pay subsequently imposed municipal tax claims or taxes assessed to the above referenced Property, all payments that I have made under the Payment Program will be applied pro rata to the principal, interest and penalty due on the claims and *thereafter NTF or its agents may take legal action against me or the Property to satisfy the outstanding amounts owed to the Claims,* including interest, penalties and costs (including attorney's fees).

Br. in Supp. of the Houck Pls.' Mot. for Summ. J. and in Opp'n to Defs.' Mot. for Summ. J., ex. 2 (emphasis added). Defendants agree, at bottom, that they will forbear on the collection of the total sum owed as long as plaintiffs make timely payments under the new plans. The payment plans delineate specific amounts of time, ranging from six to twenty-four months, over which the payment can be extended. Defendants therefore agreed to provide further time for payment, and specified that, so long as plaintiffs made timely payments under the plan, no legal action would be taken. Such an agreement to extend time does not appear to have been available prior to the time that the payment plans were offered.

We hold that the terms provided in the payment plans should be read as constituting a forbearance under the Pennsylvania usury law. A forbearance is widely considered a "use of money" for the purposes of usury law. Pennsylvania courts have found that the usury law applies when there has been either a loan of money or a forbearance on a debt. *See Equipment Finance*, 218 A.2d at 82 (citing with approval *Melnicoff v. Huber Inv. Co.*, 12 Pa. D. & C. 405, 408 (1929), where the court held that "the law seems to be settled that usury can only attach to a loan of money or to the forbearance of a debt. . . ."). The United States Supreme Court, in the often-cited case, *Hogg v. Ruffner*, also suggested that forbearance on the collection of

---

8. The Court of Appeals has long adopted the rationale discussed by the Tenth Circuit and the District of Connecticut, having held in the perennial case, *In re Tastyeast, Inc.*, that the New Jersey usury statute did not apply to the assessment of post-maturity interest "because the debtor may discharge himself from [the obligation] by punctual payment of the principal." *In re Tastyeast, Inc.*, 126 F.2d 879, 882 (3d Cir.)(considering a debtor's appeal from an adverse order on the amount of interest to be paid a mortgagee), *cert. denied*, 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942). *See also* 47 C.J.S. Interest & Usury § 140 (1982)("Thus, where the terms of a contract permit the debtor to discharge himself by paying the sum lawfully due on or before a specified date, a provision imposing on him a more burdensome payment, although exceeding the rate of return allowed by law, in the nature of a penalty for a failure to pay by the date so specified, will not render the contract usurious."). The rule underlying this rationale is that a debtor cannot, by a voluntary act, render an otherwise valid transaction usurious. *See, e.g., O'Connor v. Televideo Sys., Inc.*, 218 Cal.App.3d 709, 714, 267 Cal.Rptr. 237, 239–40 (1990).

money owed constitutes usury. *Hogg,* 66 U.S. (1 Black) 115, 118–19, 17 L.Ed. 38 (1861) ("To constitute usury [under an Indiana statute reflecting the common law definition], there must either be a loan and a taking of usurious interest, or the taking of more than legal interest for the forbearance of a debt or sum of money due.").

■ This still does not end our analysis, however, as we believe that an interest rate beyond that allowed by law can only be considered usurious if it exists as consideration for the creditor's forbearance. *See, e.g., Scientific Prods.,* 457 F.Supp. at 1378 (no violation of the usury law where a monthly charge of one and one half percent was for non-payment, rather than "a separate agreement to postpone collection in return for an additional consideration."); *Ferguson v. Electric Power Bd. of Chattanooga, Tenn.,* 378 F.Supp. 787, 790 (E.D.Tenn.1974)(charge imposed because of late payment of a debt is within the meaning of the Tennessee usury statute only when it is consideration for creditor's forbearance of asserting right of collection), *aff'd,* 511 F.2d 1403 (6th Cir.1975).

While it has been established that the interest rate charged by defendants is beyond that allowed under Pennsylvania law, and that defendants, through the payment plans, are forbearing on collecting the money owed, it has not been shown that the rate being charged is in any way *consideration* for this forbearance. The facts presented illustrate that defendants have received no additional consideration in return for the terms offered under the payment plans. The interest rate charged for late payment is not consideration for the payment plans, but a part of the consideration for the original transaction.

Further, defendants are not charging plaintiffs a rate for participating in the plans which is higher than plaintiffs would be charged if they did not participate. This is therefore not the typical forbearance situation, in which the debtor could not pay his or her obligation upon its due date and the creditor agreed to extend the period of repayment of the debt for additional consideration.

Thus, the facts of this case preclude us from finding that defendants, by offering the payment plans and thus forbearing on the immediate collection of the debt owed, modified the original transaction so as to bring it within the ambit of the Pennsylvania Loan Interest Protection Law. We will therefore deny plaintiffs' motion for summary judgment concerning count V of the complaint, and we will grant defendants' motion for summary judgment.

B) *Pennsylvania Unfair Trade Practices and Consumer Protection Law (Houck Plaintiffs)*

The Pennsylvania Unfair Trade Practices and Consumer Protection Law provides, in relevant part, that:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared to be unlawful by section 3 of this act, may bring a private action, to recover actual damages or one hundred dollars ($100), whichever is greater.

73 P.S. § 201–9.2(a) (West Supp.1998) (footnote omitted).

■ Defendants allege, without rejoinder from plaintiffs, that the charging of interest, fees and penalties does not constitute an "unfair method[ ] of competition" or "unfair or deceptive act[ ] or practice[ ]" under the UTP/CPL. 73 P.S. § 201–2(4) (West Supp.1998). Like defendants, we believe that the UTP/CPL is not intended to protect consumers against the charging of interest, fees and penalties that allegedly exceed the amounts authorized under the Municipal Claims Act and the LIPL.

"In a properly supported motion for summary judgment, the non-movant must produce some (that is, more than a "scintil-

la" of) evidence in support of his position." *Miller v. City of Philadelphia,* 174 F.3d 368, 377 (3d Cir.1999), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also National State Bank v. Federal Reserve Bank of New York,* 979 F.2d 1579, 1581–82 (3d Cir.1992)("[w]here the movant is the defendant, or the party without the burden on the underlying claim, the movant has no obligation to produce evidence negating its opponent's case. The moving party merely has to point to the lack of any evidence supporting the non-movant's claim."); *American Int'l Underwriters Corp. v. Zurn Indus., Inc.,* 771 F.Supp. 690, 697 (W.D.Pa.1991)(" '[t]he burden on the moving party is to show that there is an absence of evidence to support the non-moving party's case.' ... Once the moving party does so, then the non-moving party may successfully controvert it only by supplying some actual evidence or the real promise of actual evidence at trial.").

Plaintiffs have not presented evidence supporting their claim under the UTP/CPL. On the facts before us, we conclude that plaintiffs have failed to establish a viable claim under the UTP/CPL, and we

will grant defendants' motion for summary judgment.

### C) *Fair Debt Collection Practices Act (All Plaintiffs)*

The Fair Debt Collection Practices Act was enacted "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e) (West 1998). The FDCPA thus prohibits the charging of interest rates or other fees not authorized by an express agreement or permitted by law. *Id.* at § 1692f(1). As we have determined under section A of this opinion that the rate of interest and penalty charged plaintiffs are not specifically authorized under the Home Rule Charter Law, the only remaining question is whether the FDCPA applies to the transactions and prohibits the rate charged by defendants.

■ Defendants argue that the FDCPA does not apply to the transactions at issue.[9] First, they contend that neither taxes, water charges, nor sewer charges con-

9. In *Zimmerman v. HBO Affiliate Group,* the Court of Appeals opined that the type of transaction the FDCPA addresses is the same type of transaction as "in all other subchapters of the Consumer Credit Protection Act, i.e., one involving the offer or extension of credit to a consumer." 834 F.2d 1163, 1168 (3d Cir. 1987)(tort liability to pay for pirated cable signal is not consumer debt). At least six other Courts of Appeals have disavowed this interpretation. *See Romea v. Heiberger & Assocs.,* 163 F.3d 111, 115 (2d Cir.1998)(back rent is considered a debt under the FDCPA); *Snow v. Jesse L. Riddle, P.C.,* 143 F.3d 1350, 1353 (10th Cir.1998)(debt is created for the purposes of the FDCPA where one obtains goods in return for a dishonored check); *Duffy v. Landberg,* 133 F.3d 1120, 1123–24 (8th Cir.)(same), *cert. denied,* — U.S. —, 119 S.Ct. 62, 142 L.Ed.2d 49 (1998); *Brown v. Budget Rent–A–Car Sys., Inc.,* 119 F.3d 922, 924 n. 1 (11th Cir.1997)(unpaid administrative and other fees charged under a rental agreement in the event of an accident constituted debt under the FDCPA); *Charles v. Lundgren & Assocs., P.C.,* 119 F.3d 739, 741–

42 (9th Cir.)(dishonored checks constitute debts under the FDCPA), *cert. denied,* — U.S. —, 118 S.Ct. 627, 139 L.Ed.2d 607 (1997); *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.,* 111 F.3d 1322, 1326 (7th Cir.1997)(dishonored check, although not a credit-based transaction, is a debt under the FDCPA). Courts without this circuit have consistently held that the plain meaning and legislative history of the FDCPA do not limit the meaning of "debt" to an offer or extension of credit. Rather, the FDCPA has been held to extend to any obligation arising out of a consensual consumer transaction.

Courts within this circuit have found it necessary, however, to follow the *Zimmerman* definition of debt. *See, e.g., Bezpalko v. Gilfillan, Gilpin & Brehman,* No.Civ.A. 97–4923, 1998 WL 321268 (E.D.Pa. June 17, 1998); *Dolente v. McKenna,* No.Civ.A. 95–7142, 1997 WL 164266 (E.D.Pa. Apr. 7, 1997); *Sarver v. Capital Recovery Assocs., Inc.,* 951 F.Supp. 550 (E.D.Pa.1996); *Adams v. Law Offices of Stuckert & Yates,* 926 F.Supp. 521 (E.D.Pa. 1996). These courts have disagreed with the

stitute "debt" for the purposes of the FDCPA. In addition, they claim that National Tax, Capital Assets, and CARC are not "debt collectors" as that term is defined by the FDCPA. Defendants also argue that neither CARC's notices nor the interest, penalties, and costs charged by National Tax violate the FDCPA. Finally, defendants claim that should we find that the FDCPA applies, all defendants are protected by the "bona fide error" exclusion.

1. Do taxes, water charges and sewer charges constitute "debt" under the FDCPA?

█ Defendants argue that the tax debts, water charges and sewer charges at issue do not constitute "debt" under the FDCPA. Concerning the tax debts at issue, defendants argue that they did not violate the FDCPA because the tax obligations transferred to National Tax retain their tax claim identity. We agree. In *Maierhoffer v. GLS Capital, Inc.*, the Pennsylvania Commonwealth Court considered this issue and ruled that the existence of a tax or municipal lien is not extinguished by the assignment of the claim to a third party. *Maierhoffer*, 730 A.2d 547, 551 n. 16 (Pa.Cmmwlth.1999). The court's reasoning is persuasive.

In *Staub v. Harris*, the Court of Appeals determined that tax liabilities do not constitute "debt" under the FDCPA.[10] *Staub*, 626 F.2d 275, 278 (3d Cir.1980). *See also* FTC Statements of General Policy or Interpretation Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed.Reg. 50,097, 50,102 (1988)(unpaid taxes are not "debts" under the FDCPA). Under *Staub*, interest and penalties on the tax

debt portion of the debt being collected by defendants is not regulated by the FDCPA.

Interpreting the decision in *Staub* in light of the Pennsylvania Commonwealth Court's decision in *Maierhoffer*, in our judgment it is irrelevant that defendants here are private entities rather than government actors. While the Pollice plaintiffs argue that *Staub* is distinguishable as the instant case involves only FDCPA claims that were asserted after the sale of the tax claims to non-governmental actors, this argument is unpersuasive in light of *Maierhoffer*. The FDCPA claims asserted here could just as well have been asserted against the City had plaintiffs chosen to do so. The fact that they waited until after the claims were sold should not give them a remedy that did not otherwise exist.

█ We reach a different conclusion, however, concerning the non-tax debts at issue here. *Staub* is silent as to debts such as sewer and water charges, which, unlike tax debts, appear to be debts incurred for a household purpose. Further, defendants' argument that plaintiffs have failed to show that an agreement exists under section 1692f(1) is unconvincing. We thus hold that the sewer and water claims at issue are properly considered as "debts" under the FDCPA, and that the amount of interest and penalty charged by defendants exceeded that permitted by law.

2. Are National Tax, Capital Assets and CARC considered "debt collectors" · for the purposes of the FDCPA?

The FDCPA only regulates the actions of "debt collectors." A debt collector is

argument that the *Zimmerman* definition of debt was merely dicta and have acknowledged an obligation to follow precedent. We recognize, along with these courts, that we are obligated, under the law of this circuit, to find that "an offer or extension of credit" is necessary for a transaction to give rise to a debt under the FDCPA. As defendants have not advanced this interesting and potentially relevant issue, we will not consider it here.

10. "Debt" is defined under the Act as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5).

defined by the statute as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another...." 15 U.S.C. § 1692a(6) (West 1998). The FDCPA defines a "creditor" as "any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." 15 U.S.C. § 1692a(4) (West 1998).

■ National Tax and Capital Assets assert that they cannot be considered "debt collectors" because they are not in the business of collecting debts and do not in fact collect debts. CARC, defendants argue, is the sole defendant which has contracted with the City, School District and PWSA to service and collect the claims owned by National Tax. We agree with defendants, and find that National Tax and Capital Assets are not debt collectors under the Act.

■ CARC next contends that it is entitled to an exemption from the FDCPA because it has stepped into the shoes of an "officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties." 15 U.S.C. § 1692a(6)(C) (West 1998). We disagree.

In *Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260 (9th Cir.1996), *cert. denied*, 521 U.S. 1106, 117 S.Ct. 2484, 138 L.Ed.2d 992 (1997), *cert. denied*, 521 U.S. 1111, 117 S.Ct. 2496, 138 L.Ed.2d 1003 (1997), the Court of Appeals considered the applicability of FDCPA regulations to a private agency that had guaranteed a student's federal educational loan. After the student defaulted on the loan, the guaranty agency, USA Funds, paid the loan in accord with its guarantee commitment and began collection proceedings. The student then brought suit alleging a violation of the FDCPA, and USA Funds argued that it was entitled to an FDCPA exemption under § 1692a(6)(C). The court disagreed, holding that "[t]he FDCPA does not provide an exemption for guaranty agencies that acquire a student loan after default in order to pursue its collection." *Brannan*, 94 F.3d at 1262. The court explained that:

> "[W]here a statute names the parties which come within its provisions, other unnamed parties are excluded." *Foxgord v. Hischemoeller*, 820 F.2d 1030, 1034 (9th Cir.), *cert. denied*, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 502 (1987). This exemption applies only to an individual government official or employee who collects debts as part of his government employment responsibilities. USA Funds is a private nonprofit organization with a government contract; it is not a government agency or employee.

*Brannan*, 94 F.3d at 1263. We are persuaded by the reasoning of *Brannan*, and hold that CARC cannot claim an exemption from the FDCPA under 15 U.S.C. § 1692a(6)(C).

### 3. Did CARC act in violation of the FDCPA?

As we have found that CARC acted in violation of the FDCPA to the extent that it charged a rate of interest and penalties for water and sewer claims not authorized by law, we need not consider the Pollice plaintiffs' alternative claim that CARC's notices contained statements that violated the prohibition of section 1692e against making false, deceptive or misleading representations in connection with the collection of a debt.

### 4. Does the "bona fide error" defense apply to CARC's actions?

■ CARC claims that in determining the rates to be charged plaintiffs, it relied

on the representations of the City, School District and PWSA that the rates were appropriate, as well as the fact that these entities had empirically been charging these rates. CARC asserts that, assuming that the rate of interest and penalty charged is unauthorized by law, the bona fide error exception of the FDCPA should bar a judgment against them.

No civil liability can be imposed under the FDCPA "if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error...." 15 U.S.C. § 1692k(c). While courts have typically limited the application of this defense to clerical errors, we recently held that the bona fide error defense could be applied to errors of legal judgment as well. *Aronson v. Commercial Fin. Servs., Inc.,* No.Civ.A. 96–2113, 1997 WL 1038818, at *5 (W.D.Pa. Dec. 22, 1997).

Section 1692k(c) also specifies that any error must have occurred "notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). The burden rests with CARC to show that it has met this standard. *See Fox v. Citicorp Credit Servs., Inc.,* 15 F.3d 1507, 1514 (9th Cir.1994); *Adams v. Law Offices of Stuckert & Yates,* 926 F.Supp. 521, 529 (E.D.Pa.1996). However, the application of this standard to mistake of legal error, rather than the traditional clerical error, is less than clear. With this in mind, and examining the evidence in the light most favorable to defendants, we find that questions of material fact exist concerning those measures which were taken by defendants to insure that they are entitled to charge a rate of over 10% in interest and penalties for past-due tax debts, water charges and sewer charges. Accordingly, the motion of Houck plaintiffs for summary judgment on their FDCPA claims will be denied. The motion of defendants for summary judgment concerning the FDCPA claims of the Houck plaintiffs and the Pollice plaintiffs will be denied as to CARC.

### D) *Truth–In–Lending Act (Pollice Plaintiffs)*

The Court of Appeals, explaining the purpose of the Truth–In–Lending Act, 15 U.S.C. § 1601 *et seq.* (West 1998), stated:

Through TILA, Congress sought to remedy the "divergent and often fraudulent practices by which credit customers were apprised of the terms of the credit extended to them." *Johnson v. McCrackin–Sturman Ford, Inc.,* 527 F.2d 257, 262 (3d Cir.1975).

Indeed, the congressionally stated purpose of the TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." 15 U.S.C. § 1601(a). TILA, as a remedial statute which is designed to balance the scales "thought to be weighed in favor of lenders," is to be liberally construed in favor of borrowers. *Bizier v. Globe Financial Services,* 654 F.2d 1, 3 (1st Cir.1981). *See Johnson,* 527 F.2d at 262.

TILA achieves its remedial goals by a system of strict liability in favor of the consumers when mandated disclosures have not been made. 15 U.S.C. § 1640(a). A creditor who fails to comply with TILA in any respect is liable to the consumer under the statute regardless of the nature of the violation or the creditor's intent. *Thomka v. A.Z. Chevrolet Inc.,* 619 F.2d 246, 249–50 (3d Cir. 1980). "[O]nce the court finds a violation, no matter how technical, it has no discretion with respect to liability." *Grant v. Imperial Motors,* 539 F.2d 506, 510 (5th Cir.1976).

*Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 896, 898 (3d Cir.1990).

The Pollice plaintiffs base their TILA claim on the assertion that the first and only time plaintiffs were offered consumer credit occurred when they received the payment plans from National Tax and CARC. Plaintiffs assert that defendants

can not rely on the argument that any TILA disclosures that were required should have been made by the assignors of plaintiffs' debt, as no such disclosures by the assignors were ever required.

Defendants respond with three main arguments for the inapplicability of the TILA to the instant case. First, defendants contend that the TILA does not apply to the transactions at issue because neither National Tax nor CARC is a "creditor" as defined by the statute. In addition, defendants argue that the TILA does not apply to the collection of water and sewer rate charges. Finally, defendants maintain that the instant case involved no "consumer credit transaction" which would trigger the applicability of the TILA.[11]

### 1. Do defendants constitute "creditors" under the TILA?

The TILA provides that the term "creditor" applies only to a person who both: (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(f) (West 1998).[12] Defendants argue that neither National Tax nor CARC constitute an entity to which "the debt arising from the consumer credit transaction is initially payable." As the Federal Reserve Board has provided in its regulations,[13] "[i]f an obligation is initially payable to one person, that person is the creditor even if the obligation by its terms is simultaneously assigned to another person." 12 C.F.R. Pt. 226, Supp. I at 300 (1998).

■ In the instant case, defendants argue that the City, School District and PWSA are the parties to whom plaintiffs were initially obligated to pay for the debt which they had accrued. As such, the City, School District and PWSA, not National Tax and CARC, must be considered creditors for the purposes of the TILA.[14]

■ The Pollice plaintiffs assert that, while the City, School District and PWSA may have been the parties to whom the debt was originally payable, there was no consumer credit transaction at the time that the debt was incurred. Plaintiffs argue that the payment plans offered by

**11.** Defendants also argue that the TILA does not apply because the "credit" was not extended "primarily for personal, family or household purpose." As this argument involves the same general standard as defendants' consumer credit transaction argument, we will address these together.

**12.** While the TILA is primarily focused on the entity that is defined as a "creditor," Congress also provided a cause of action against a subsequent assignee of the original loan under certain circumstances. 15 U.S.C. § 1641(a). Plaintiffs in the instant case have not alleged that defendants are liable as assignees, but rather contend that defendants are the initial creditors in the transactions at issue.

**13.** The Supreme Court has held that, because the complexity and variety of credit transactions covered by the TILA "defy exhaustive regulation by a single statute[,] Congress ... delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit." *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 559–60, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980). The Board has attempted to fill the gaps left in the statute by promulgating Regulation Z, 12 C.F.R. 226. As the Court noted, "Congress has specifically designated the Federal Reserve Board and staff as the primary source for interpretation and application of truth-in-lending law." *Ford Motor Credit Co.,* 444 U.S. at 566, 100 S.Ct. 790.

**14.** Defendants argue that CARC cannot be considered a creditor under the TILA because it is merely an agent, rather than the entity to which the debts are payable. We agree, and therefore will grant defendants' motion for summary judgment regarding Pollice plaintiffs' TILA claims as to CARC.

defendants constitute the first credit transactions entered into by plaintiffs. In so arguing, Pollice plaintiffs distinguish the relationship between plaintiffs and the City, School District and PWSA, which they consider a "debt" relationship, from the relationship between plaintiffs and National Tax, which they term a "credit" relationship. Pollice plaintiffs argue that National Tax modified the original relationship by offering payment plans, as in offering such plans, it was "elect[ing] to forbear on its collection and foreclosure rights," and thus creating a credit relationship.[15]

Plaintiffs assert, in essence, that there was no "creditor" in the transactions for the purposes of the TILA until National Tax offered the payment plans. Up until that time, plaintiffs had no "right to defer payment of debt or to incur debt and defer its payment," as credit is defined under the act. 12 C.F.R. § 226.2(a)(14). Defendants, by agreeing through a written provision to forbear on the collection of the debt as long as plaintiffs agreed to make payments in accordance with the terms of the new agreement, modified their relationship with plaintiffs, and created the first "consumer credit transaction." As previously discussed in relation to the LIPL, at no time prior to the extension of payment plans did plaintiffs have a right to defer payment of debt. Up until that point, plaintiffs were subject to the immediate exercise of defendants' legal right to obtain the money owed or to foreclose on the property.

While we recognize that adopting plaintiffs' interpretation of the creditor provision of the TILA necessitates finding that the act may not require the City, School District and PWSA to make the disclosures otherwise mandated by the act, we are nonetheless convinced that a plain reading of the act compels this result.

2. Does the TILA utility exemption apply to the collection of water and sewer rate charges by a non-utility?

 Section 1603 of the TILA exempts public utility charges as follows:

This subchapter does not apply to the following:

\* \* \* \* \* \*

(4) Transactions under public utility tariffs, if the Board determines that a State regulatory body regulates the charges for the public utility services involved, the charges for delayed payment, and any discount allowed for early payment.

15 U.S.C. § 1603.

Regulation Z further provides:

This regulation does not apply to the following:

\* \* \* \* \* \*

(c) Public utility credit. An extension of credit that involves public utility services provided through pipe, wire, other connected facilities, or radio or similar transmission (including extensions of such facilities), if the charges for service,

---

**15.** In addition, we note that defendants, by offering payment plans which allow for the forbearance on collection, have assessed interest and penalties that constitute a finance charge under the TILA. Regulation Z sets forth charges that are not considered finance charges under the act. Section 226.4(c) reads, in relevant part:

The following charges are not finance charges:

\* \* \* \* \* \*

(2) Charges for actual unanticipated late payment, for exceeding a credit limit, or for delinquency, default, or a similar occurrence.

12 C.F.R. § 226.4(c) (1998). The supplement to Regulation Z further clarifies this exception, however, adding factors which should be included in determining whether a charge is for an actual unanticipated late payment. One of the considerations is the practice of the creditor in handling the accounts. If the creditor allows consumers to "pay the accounts over a period of time without demanding payment in full or taking other action to collect" the full amount, the supplement provides that the charge may be a finance charge. 12 C.F.R. Pt. 226, Supp. I at 312 (1998).

delayed payment, or any discounts for prompt payment are filed with or regulated by any government unit. The financing of durable goods or home improvements by a public utility is not exempt.

12 C.F.R. § 226.3 (footnote omitted).

Defendants argue that, under these sections of the TILA and Regulation Z, when a debt arises from public utility services, it cannot constitute consumer credit. We disagree. While we recognize that a public utility is exempt from TILA disclosures upon extending credit to a debtor for utility services,[16] the exemption is applicable only if the charges are filed or regulated by a governmental unit.

In the instant case, as we have established, the payment plans offered by defendants constituted a new extension of credit. This new extension was made well after the liens and claims were acquired by National Tax. Defendants cannot claim reliance on the public utility exemption, despite the fact that the nature of the utility claims and liens have not changed in essence by the assignment to National Tax. The distinction here is that utilities are overseen and regulated by a governmental unit to which National Tax is not subject.

The credit charges assessed by National Tax are not "filed with or regulated by any government unit," as required under Regulation Z. While defendants argue that the City and relevant authorities approved all payment plans and charges, this type of contractual relationship is too tenuous to constitute the governmental unit regulation required for the exemption.

3. Does a "consumer credit transaction" exist between plaintiffs and defendants? Was the "credit" extended "primarily for personal, family or household purpose"?

■ National Tax claims that it is entitled to a TILA exemption, at least with respect to the tax liens at issue, on the basis that the Court of Appeals has determined that a tax debt is not considered primarily for personal, family or household purposes under the FDCPA. *See Staub,* 626 F.2d 275. Defendants further contend that Regulation Z expressly states that the payment of tax liens is not considered "credit" subject to the TILA. The Federal Reserve Board Official Staff Commentary to Regulation Z, 12 C.F.R. Pt. 226, Supp. I at 299 (1998), concerning exclusions from the definition of credit found at 12 C.F.R. § 226.2(a)(14), provides that "tax liens, tax assessments, court judgments, and court approvals of reaffirmation of debts in bankruptcy" are excluded from the definition. The Staff Commentary continues, noting that "third-party financing of such obligations (for example, a bank loan obtained to pay off a tax lien) is credit for the purposes of the regulation." 12 C.F.R. Pt. 226, Supp. I at 299 (1998).

As we rehearsed in our September 3, 1998, Memorandum Order, National Tax, as the legal holder of the tax liens at issue, maintains the rights of the original holder of the liens. Such liens are not considered any less tax claims by virtue of their assignment to National Tax. This holding is consistent with *Maierhoffer v. GLS Capital, Inc.,* where the court found that tax liens are assignable as a matter of law under the Municipal Claims and Tax Liens Act.

While we have found that the payment plans offered by defendants altered the relationship between the parties so as to create a forbearance where none otherwise existed, we did not conclude that the nature of the underlying claim had been extinguished. Thus, we cannot agree with plaintiffs' contention that defendants somehow altered the nature of the tax liens by offering payment plans. The forbearance by National Tax under the terms of the payment plans does not constitute third-party financing as contemplated under

---

16. *See, e.g., Ferguson,* 378 F.Supp. 787 ("the Federal Reserve Board has specifically exempted late charges in public utility bills from the disclosure provisions of the [TILA].").

Regulation Z. Further, National Tax, as the owner of the tax liens, is not a third party lender. Accordingly, we will grant defendants' motion for summary judgment with respect to the tax liens at issue, and we will deny the motion concerning the water and sewer charges at issue.

### E) *Fraudulent Overcharges and Unjust Enrichment (Pollice Plaintiffs)*

Pollice plaintiffs contend that the assignment of delinquent tax and other municipal claims to National Tax by local governmental bodies is invalid under Pennsylvania law, and, as such, plaintiffs were overcharged in interest and penalties. Plaintiffs further contend that National Tax committed fraudulent misrepresentation and was unjustly enriched by such overcharges. Plaintiffs recognize that these state law claims are largely dependant on the argument that the original owners of the liens and claims could not assign their right to charge higher interest and penalties to National Tax. *See* Pollice Pls. Br. in Opp'n to Defs.' Mot. for Summ. J., at 4, 24.

The Commonwealth Court, in its recent decision in *Maierhoffer,* addressed this precise issue and held that such liens are assignable as a matter of law under the Municipal Claims and Tax Liens Act. *Maierhoffer,* 730 A.2d at 551. Because the Commonwealth Court's analysis is compelling, plaintiffs' claims of fraudulent misrepresentation and unjust enrichment cannot stand, and defendants' motion for summary judgment will be granted on these counts.

An appropriate order will follow.

### ORDER

AND NOW, this 29th day of July, 1999, after consideration of the cross-motions for summary judgment (doc. nos.77, 85) of defendants, National Tax Funding, L.P., Capital Asset Research Corp. Ltd., and Capital Assets Holdings GP, Inc., and plaintiffs Gladys Houck, Marie Demitras, Bragette Parker, Mary Walsh, Mary Tabb, et al., the written submissions of these parties, and the written submissions of plaintiffs Tito and Violet Pollice, et al.,

IT IS ORDERED that defendants' motion for summary judgment shall be and hereby is GRANTED concerning Houck plaintiffs' claims under the Pennsylvania Loan Interest and Protection Law and Unfair Trade Practices and Consumer Protection Law.

IT IS FURTHER ORDERED that the motion of the Houck plaintiffs for summary judgment shall be and hereby is DENIED on these counts.

IT IS FURTHER ORDERED that defendants' motion for summary judgment concerning the Fair Debt Collections Practices Act claims of both sets of plaintiffs shall be and hereby is GRANTED with respect to defendants National Tax and Capital Assets and with respect to the tax liens at issue, and DENIED as to all other claims.

IT IS FURTHER ORDERED that the motion of the Houck plaintiffs for summary judgment concerning the Fair Debt Collection Practices Act shall be and hereby is DENIED.

IT IS FURTHER ORDERED that the motion of defendants for summary judgment concerning the Pollice plaintiffs' Truth in Lending Act claim shall be and hereby is GRANTED as to defendant CARC and with regard to the tax liens at issue, and DENIED in all other respects.

IT IS FURTHER ORDERED that the motion of defendants for summary judgment concerning the Pollice plaintiffs' claims of unjust enrichment and fraudulent misrepresentation shall be and hereby is GRANTED.